**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI**

ELAINE T. HUFFMAN and
CHARLENE S. SANDLER,

                     Plaintiffs,

vs.

CREDIT UNION OF TEXAS,

                  Defendant.

Case No. 11-0022-CV-W-ODS

**PLAINTIFFS' SUGGESTIONS IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................................1

PART I

I.     RESPONSE TO DEFENDANT'S STATEMENT OF ALLEGEDLY UNCONTROVERTED MATERIAL FACTS. ..................................................................3

II.    ADDITIONAL UNDISPUTED FACTS PRECLUDING THE ENTRY OF SUMMARY JUDGMENT IN FAVOR OF DEFENDANT ............................................30

       A.     Defendant's Underwriting Guidelines Contained a Mechanism to Disguise and Conceal Charges for Default and VSI Insurance Premiums to Be Paid and Financed by Plaintiffs. ......................................................................30

       B.     Defendant Disclaimed Any Responsibility to Ensure that its Loans Complied with the Disclosure Requirements of Federal and/or Missouri State Law. ...................................................................................................34

       C.     Facts Giving Rise to Plaintiff Huffman's Claims ..................................................35

       D.     Facts Giving Rise to Plaintiff Sandler's Claims ...................................................37

       E.     Plaintiffs' Discovery of Facts Constituting the Fraud Underlying their MMPA Claims. ...................................................................................................40

       F.     Defendant's Misconduct Occurring After the Plaintiffs' Initial Sales and Financing Transactions ........................................................................................40

       G.     The Finance Charge and Annual Percentage Rate were materially understated on the Plaintiffs' loans as a result of the concealment of the insurance charges. .............................................................................................41

PART II

III.   ARGUMENTS AND LEGAL AUTHORITIES ...............................................................1

       A.     SUMMARY JUDGMENT STANDARD. ............................................................1

       B.     DEFENDANT'S MOTION RAISES DISPUTED QUESTIONS OF FACT PRECLUDING THE ENTRY OF SUMMARY JUDGMENT...................2

              1.     The jury must be allowed to address whether the default insurance premium charges should have been disclosed on the Plaintiffs' Retail Installment Contracts and Security Agreements. .............................2

2.   §516.120(5) RSMo and Its "Discovery Rule" Of "The Facts Constituting The Fraud" Applies To The Fraud Underlying Plaintiffs' MMPA Claims. ...........................................................................4

C.   BECAUSE OF THE DISCLOSURE REQUIREMENTS OF FEDERAL AND MISSOURI LAW, DEFENDANT'S STATUTE OF LIMITATIONS DEFENSE INVOLVES DISPUTED QUESTIONS OF FACT. ...........................................................................................................6

1.   The charges for the default insurance premiums should have been disclosed to the Plaintiffs pursuant to Federal law. ...................................6

2.   The charges for the default insurance premiums should have been disclosed to the Plaintiffs pursuant to Missouri law. ..................................9

3.   Because of these disclosure obligations under federal and Missouri law, the statute of limitations for Plaintiffs' MMPA claims is tolled and/or does not accrue until actual discovery of the facts constituting the fraud underlying their MMPA claims. .........................11

D.   SUMMARY JUDGMENT IS IMPROPER BECAUSE DEFENDANT'S MISCONDUCT AFTER THE INITIAL SALES TRANSACTIONS SERVES AS ADDITIONAL REASONS TO TOLL OR EXTEND THE STATUTE OF LIMITATIONS. .........................................................................16

IV.   CONCLUSION .............................................................................................................18

# TABLE OF AUTHORITIES

## Cases

*Adams v. Plaza Fin. Co., Inc.*, 168 F.3d 932, 934 (7th Cir. 1999) ...................................9

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970)...............................................................1

*Aetna Cas. & Sur. Co. v. Fernandez*, 830 F.2d 952 (8th Cir. 1987)...................Part I, 2; Part II, 14

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ...................................................2

*Bailey v. Glover,* 88 U.S. (21 Wall.) 342, 22 L.Ed. 636 (1874) .......................................5

*Boulds v. Chase Auto Fin. Corp.*, 266 S.W.3d 847 (Mo.App.E.D.  ..............................13

*Briece v. Bosso,* 158 S.W.2d 463 (Mo.App.E.D.1942) .......................................Part I, 2

*Brown v. Irving-Pitt Mfg. Co.*, 316 Mo. 1023, 292 S.W. 1023 (1927).........................14

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .............................................................1

*Clement v. St. Charles Nissan, Inc.*, 103 S.W.3d 898 (Mo.App.E.D. 2003) .................5

*Fielder v. Credit Acceptance Corp.*, 19 F.Supp. 2d 966, 982 (W.D. Mo. 1998),
    *vacated in part on other grounds,* 188 F.3d 1031 (8th Cir. 1999)...............10, 17

*Florom v. Elliott Mfg.*, 867 F.2d 570 (10th Cir. 1989) ...................................................1

*Gibbons v. J. Nuckolls, Inc.*, 216 S.W.3d 667 (Mo. banc 2007)....................................5

*Gibson v. LTD, Inc.*, 434 F.3d 275 (4th Cir. 2006).........................................................8

*Hicks v. Star Imports, Inc.*, 5 Fed.Appx. 222 (4th Cir. 2001)...........................................9

*Hope v. Nissan N. Am., Inc.*, 353 S.W.3d 68 (Mo.App. 2011)............................Part I, 2; Part II, 5

*Household Credit Services, Inc. v. Pfennig*, 541 U.S. 232 (2004)...................................7

*Huch v. Charter Communications, Inc.*, 290 S.W.3d 721 (Mo. banc 2009) .................5

*Huffman v. Credit Union of Texas*, 2011 WL 5008309 (W.D.Mo. 2011) .......................4

*In re Consol. "Non-Filing Ins." Fee*, 2001 WL 35840127 (M.D.Ala. 2001) .................2

*Mancuso v. Long Beach Acceptance Corp.*, 254 S.W.3d 88 (Mo.App. W.D. 2008) ...................17

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).......................................1

*McCrary v. Truman Medical Center, Inc.,* 916 S.W.2d 831 (Mo.App.W.D. 1995)......................13

*Merck & Co., Inc. v. Reynolds*, 130 S. Ct. 1784 (2010) .......................Part I, 2, Part II, 5, 6, 12, 14

*Mitchell v. Residential Funding Corp.*, 334 S.W.3d 477 (Mo.App.W.D. 2010). ...........................3

*Mourning v. Family Publications Service,* 411 U.S. 356, 377 (1972) ............................................7

*Owen v. General Motors Corp.,* 533 F.3d 913 (8th Cir. 2008) ..................................................5, 14

*Parker v. De Kalb Chrysler Plymouth,* 673 F.2d 1178 (5th Cir. 1982).........................................7

*Rademeyer v. Farris*, 284 F.3d 833 (8th Cir. 2002) ....................................................................14

*Ramadan v. Chase Manhattan Corp.*, 156 F.3d 499 (3rd Cir. 1998) .................................................5

*Rashaw v. United Consumers Credit Union*, 685 F.3d 739 (8th Cir. 2012)....................................4

*Robert Johnson Grain Co. v. Chemical Interchange Co.,*
    541 F.2d 207, 209 (8th Cir. 1976) ...................................................................................1

*Schuchmann v. Air Services Heating & Air Conditioning, Inc.,*
    199 S.W.3d 228, 233 (Mo.App. 2006) ..........................................................................14

*Sugent v. Arnold's Estate,* 340 Mo. 603, 101 S.W.2d 715 (1937).................................................13

*Thomka v. A.Z. Chevrolet, Inc.*, 619 F.2d 246 (3rd Cir. 1980) ........................................................7

*Thompson v. Lyons*, 281 Mo. 430, 220 S.W. 942 (1920) ..............................................................14

*Togerson v. City of Rochester*, 643 F.3d 1031 (8th Cir. 2011).......................................................1

*Wabun-Inini v. Sessions*, 900 F.2d 1234 (8th Cir. 1990) ..............................................................1

*Williams v. Chartwell Financial Services, Ltd.*, 204 F.3d 748 (7th Cir. 2000) ...............................7

## <u>Federal Rules of Civil Procedure</u>

Federal Rule 56(c)..............................................................................................................1

Case 4:11-cv-00022-ODS   Document 97   Filed 01/21/13   Page 5 of 71

## Federal Statutes

15 U.S.C. § 1601(a) ....................................................................................................7

15 U.S.C. § 1602(u) ....................................................................................................7

15 U.S.C. § 1605(a) ....................................................................................................8

15 U.S.C. § 1605(c) ....................................................................................................9

15 U.S.C. § 1606(a) ....................................................................................................8

15 U.S.C. § 1638(a)(2)(A) ..........................................................................................8

15 U.S.C. § 1638(a)(5) ................................................................................................9

## Federal Regulations

12 C.F.R. § 226.1(b) ...................................................................................................7

12 C.F.R. § 226.17(a)(1) .............................................................................................7

12 C.F.R. § 226.18(b) ..................................................................................................8

12 C.F.R. § 226.18(e) ..................................................................................................8

12 C.F.R. § 226.22(a) ..................................................................................................8

12 C.F.R. § 226.22(e) ..................................................................................................8

12 C.F.R. § 226.4(a) ....................................................................................................8

12 C.F.R. § 226.4(b)(5) ...............................................................................................9

12 C.F.R. Part 226, Appendix J ..................................................................................8

12 C.F.R. Part 226, Supplement I ...............................................................................8

16 C.F.R. § 433.2 ........................................................................................................2

## Missouri Statutes

§ 365.070.6(7) .................................................................................10

§ 365.080 ........................................................................................10

§ 365.150.2 .....................................................................................10

§ 400.9-616(d) ................................................................................19

§ 407.020.1 ...........................................Part I, 1, 2; Part II, 2, 4, 5, 5, 18

§ 408.140.1(11) ..............................................................................10

§ 408.300(4) ...................................................................................11

§ 408.380.1 .....................................................................................11

§ 516.120(5) ............................................................................... *passim*

## Missouri State Regulations

15 C.S.R. § 60-8.020.1 ..............................Part I, 1; Part II, 2, 8

15 C.S.R. § 60-8.060(1) .............................Part I, 1; Part II, 2

15 C.S.R. § 60-8.090(1) .............................Part I, 1; Part II, 2, 8

15 C.S.R. § 60–9.010(1)(C) ........................Part I, 1; Part II, 2

15 C.S.R. § 60-9.110(3) ..............................Part I, 1; Part II, 2, 8

## INTRODUCTION

The Court should deny Defendant's Motion for Summary Judgment because there are disputed fact questions concerning the merits of Plaintiffs' Missouri Merchandising Practices Act ("MMPA") claims and that are raised by Defendant's motion, which includes the core questions concerning the application of the discovery rule to extend the accrual of Plaintiffs' claim per §516.120(5) RSMo until their actual discovery of the facts constituting the fraud underlying their claims, which includes facts concerning Defendant's scienter, and whether the statute of limitations should be tolled or extended for equitable reasons. Therefore, although the Plaintiffs' initial purchase and financing transactions, the creation of Defendant's security interest in their vehicles, and the repossessions of their vehicles admittedly occurred beyond the five year period preceding the filing of this action, Defendant is not entitled to judgment as a matter of law on Plaintiffs' MMPA claims.

As to the merits of Plaintiffs' claims, the jury must determine whether Defendant's motor vehicle financing program utilized "any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact" within the provisions of §407.020.1 RSMo in connection with the non-disclosure of the default insurance and VSI insurance premiums that were being "directly" or "indirectly" charged to the Plaintiffs through the terms of their financing and that Defendant obtained in connection with the PMP loans. This core merits issue also directly relates to Defendant's statute of limitations defense and the propriety of summary judgment.

That is, there are specific Missouri regulations that define "unfair practices" to include such things as "violations of state or federal law intended to protect the public" and "omissions of material facts," the latter of which requires proof of scienter. *See* 15 C.S.R. §§60-8.020.1; 60-

8.060(1); 60-8.090.1; 60-9.010(1)(C); and 60-9.110(3); *Hope v. Nissan N. Am., Inc.*, 353 S.W.3d 68, 83-84 (Mo.App.2011). Plaintiffs assert that the premium charges are "material facts" that should have been disclosed on their Retail Installment Contracts and Security Agreements ("RISC's") pursuant to federal law (because they are the "costs of credit" and "finance charges") and Missouri law (because they are "insurance" charges subject to disclosure and consent requirements). Under Missouri law, the failure to disclose material information that one is under a legal duty to truthfully disclose can provide a basis to toll the statute of limitations and/or delay the accrual of the cause of action until Plaintiffs' actual discovery of the facts constituting the fraud and Defendant's culpable mental state underlying their MMPA claims, and will excuse any lack of diligence by the Plaintiffs' in trying to discover the fraud. *See Aetna Cas. & Sur. Co. v. Fernandez*, 830 F.2d 952, 954 (8th Cir. 1987); *Briece v. Bosso,* 158 S.W.2d 463, 467 (Mo.App.E.D.1942); *Merck & Co., Inc. v. Reynolds*, 130 S. Ct. 1784, 1790, 1798 (2010).[1]

Here, it is undisputed that Plaintiffs did not discover the facts constituting the fraud underlying their MMPA claims until November 2010, shortly before this lawsuit was filed. Their MMPA claims are thus timely even though most of the actions and misconduct at issue occurred beyond the five-year period preceding the filing of this lawsuit because the jury can reasonably conclude based on the disputed facts that Defendant engaged in "unlawful practices" within the provisions of §407.020.1 RSMo in its transactions with the Plaintiffs and such unlawful practices can delay the accrual of their claims and should toll the statute of limitations for their claims.

---

[1] Because Defendant is the assignee of the Plaintiffs' RISC's, it is also subject to liability under separate law for the motor vehicle dealers' failure to disclose information of their RISC's *See Boulds v. Chase Auto Fin. Corp.*, 266 S.W.3d 847, 851 (Mo.App.E.D. 2008); 16 C.F.R. §433.2.

## I. RESPONSE TO DEFENDANT'S STATEMENT OF ALLEGEDLY UNCONTROVERTED MATERIAL FACTS.

1.     On November 24, 2010, Plaintiff Huffman and Plaintiff Sandler filed a Class Action Petition for Damages (the "Complaint") in the Circuit Court of Ray County, Missouri, Case No. 10RY-CV01328. (Doc. No. 1-1, attached as **Exhibit A**).

**RESPONSE:  Undisputed.**

2.     Defendant Credit Union of Texas was served with Plaintiffs' Complaint on December 7, 2010, and Defendant removed the case to this Court on January 5, 2011. Notice of Removal (Doc. No. 1, attached as **Exhibit B**).

**RESPONSE:  Undisputed.**

3.     Defendant Credit Union of Texas is a Texas chartered credit union regulated by the Texas Credit Union Department and insured by the National Credit Union Administration. Complaint, ¶¶ 30-31, 62 and 76; Answer ¶ 30 (Doc. No. 7, attached as **Exhibit C**).

**RESPONSE:  Undisputed for purposes of summary judgment.**

4.     Plaintiffs' Complaint alleged causes of action under Missouri's Commercial Code (Count I), the Missouri Merchandising Practices Act (Count II), and for conversion (Count III). Complaint, generally.

**RESPONSE:  Undisputed.**

5.     Plaintiffs' claims under the Missouri Commercial Code (Count I) and for conversion (Count III) were found to be time-barred and were dismissed on October 20, 2011 (Doc. No. 47, attached as **Exhibit D**).

**RESPONSE:  Undisputed.**

3

6.     Based on the allegations in their Complaint, Plaintiffs' MMPA claims appear to arise out of: (1) the alleged failure by CUofT to disclose that Defendant purchased default protection insurance in connection with Plaintiffs' loans, (2) the alleged repossession and sale of Plaintiffs' vehicles, including the sending of allegedly misleading pre- and post-sale communications, and (3) arguably, any subsequent debt-collection activities. *See* Complaint, ¶¶ 2, 7-9, 28-29, 56, 80, 85-86, 63-64.

> **RESPONSE: Disputed in part.**
>
> **Plaintiffs' MMPA claims as described in the Complaint include allegations related to Defendant's affirmative actions and misconduct designed to conceal the charges for the default and VSI insurance premiums and other fees and finance charges and Defendant's acquisition of default insurance in connection with the Plaintiffs' loans, as well as the affirmative actions and misconduct designed to conceal causes of action based upon the non-disclosure of the default and VSI insurance premiums occurring after the date of the initial sales and financing transactions. *See* Complaint (Ex. 1) at ¶¶38-42 and 81-84.[2] As a result of the Court's prior rulings and developments in this case, Plaintiffs have amended their proposed Class definition.**

7.     In January 2003, Plaintiff Huffman took out a loan to finance her purchase of a 2003 Chevrolet Cavalier. Huffman Tr. 72:11-24 (all Huffman Transcript excerpts are attached as **Exhibit E**).

> **RESPONSE:  Undisputed for purposes of summary judgment.**

8.     In connection with that loan, Plaintiff Huffman executed a Retail Installment Contract and Security Agreement dated January 10, 2003. *Id.* at 143:13-144:4; Huffman Retail

---

[2] To avoid confusion, and to assist the Court, the Exhibits attached hereto use the same numbers as those used by Plaintiffs in their Suggestions in Support of their Motion for Class Certification Doc. 83-84. Exhibits containing deposition excerpts will include those pages cited by Plaintiffs herein.

Installment Contract, attached as **Exhibit F**. The funding for Plaintiff Huffman's loan was provided by CUofT. Answer, ¶ 18.

**RESPONSE: Objection.**

**This "fact" violates Local Rule 56.1(a) which states "Each fact shall be set forth in a separately numbered paragraph" because there are multiple factual assertions set forth in the "fact."**

**Without waiving, and subject to their objections, Plaintiffs will separately address each asserted fact below.**

**a.      Undisputed for purposes of summary judgment.**

**The materials cited establish a genuine dispute of material fact as to Plaintiffs' MMPA claims and the propriety of tolling the statute of limitations. *See* Rule 56(c)(1)(A).**

**b.      Undisputed for purposes of summary judgment.**

**The materials cited establish a genuine dispute of material fact as to Plaintiffs' MMPA claims and the propriety of tolling the statute of limitations. *See* Rule 56(c)(1)(A).**

9.      CUofT purchased default protection and Vehicle Single Interest ("VSI") insurance in connection with Plaintiff Huffman's loan on or before January 29, 2003. *See* Huffman's CUofT Funding Checklist, attached as **Exhibit G**.

**RESPONSE:**

**Objection and Disputed in part.**

**Defendant's use of the word "purchased" is vague and encompasses disputed allegations concerning the merits of Plaintiffs' MMPA claims.**

**Without waiving, and subject to their objections, Plaintiffs state.**

**Plaintiffs do not dispute that in conjunction with the Plaintiffs' loans Defendant obtained "default insurance" and other insurance protecting it from expected monetary losses caused by a borrower default. *See* Ex. 6, at No. 1; Ex. 7, at p.1; Ex. 7 at p.2; Ex. 8.**

5

Defendant's citation to Exhibit G as proof of the fact is, however, disingenuous as the document is merely a checklist confirming the insurance.

The premiums for this insurance were directly or indirectly charged to and financed by the Plaintiffs without their knowledge. Ex. 18, at p.62; Ex. 19, at p.24, 26; Ex. 31, 40.

That is, in order to guarantee the insurability of each loan and to achieve a uniform 17.9% APR, the terms of each PMP loan was strictly governed by strict loan underwriting guidelines. See Ex. 9, at Recital B and §1; Ex. 10; Ex. 11, at p.1. Defendant's Lending Grid and Credit Guidelines mandated the Plaintiffs loans a "Program Rate" of a 17.9% APR and a Default Insurance Premium at 7% (later increased to 8.5%) of the amount financed (for the default insurance policy) and a uniform charge of $125.00 for the VSI policy. *See* Ex. 9, at Ex. A (CUTX005928); Ex. 12, at Declarations for Lender's Indemnity Coverage, Single Premium Rates (CUTX006052) and Loss Endorsement Rate Schedule (CUTX006058); Ex.6, at No. 1; Ex. 10, at p.1.

As both the credit unions' and the insurer's agent, Centrix worked closely with the auto dealers to construct the terms of each sales transaction to ensure that each "deal" fell within the credit guidelines and APR limits and would qualify for the default insurance. Ex. 13, at §3. L. The Dealer Guidelines for Missouri PMP loans expressly laid out the permitted APR on each deal, the fees that would be paid to the dealer, and the "Max. Advance" which governed the sale price of the vehicle (up to 115% of the Invoice/NADA Wholesale) and "Maximum Caps on Back-End Products Sold." Ex. 14; *see also* Ex. 16. Centrix also set forth minimum Amount Financed and term requirements for PMP loans to prevent "losing money on this type of deal." Ex. 15. The Dealer Agreements also made it clear that the Lender/credit union will only purchase loans that "satisfy specified lending criteria." Ex. 17, at Recital B and §4; Ex. 50, at §8 ("Loan Amount"); at §12 ("Program APR"); Ex. 19, at 27-28.

According to Plaintiff Huffman's standard form RISC, the "cash price" or total price of the motor vehicle was $21,641.93, and Plaintiff paid $4,231.47 as a down payment through the trade in of her vehicle and other rebates. Ex. 31. Based upon the disclosed "Amount Financed" of $18,705.46 and the 17.90% "Annual Percentage Rate" in the RISC, the loan required a payment of a $10,822.94 "Finance Charge" through 66 monthly payments of $447.40. Ex. 31. Based upon these figures, the internal Audit Recap sheet reflects that Defendant paid to itself $665.00 and to Centrix $3,958.20 in fees and charges which were not disclosed to Plaintiff Huffman in the mandated disclosures set forth in her RISC. *Compare* Ex. 31 and 32, at "Centrix Fee Calculation" and "Disbursement Summary."

6

**The $4,623.30 in undisclosed fees and charges included: (1) $1,714.96 in default insurance premiums (which was calculated as a set percentage of the Amount Financed); (2) $1,598.24, as a fee to Centrix Financial (calculated as a set percentage of the APR and monthly payment); and (3) the following fees totaling $665 that were ultimately paid to the motor vehicle dealer: $150.00 "admin fee;" $495.00 "acquisition fee" and $15.00 "Membership/Association Fees": Ex. 32. Defendant's internal records also reflect a "Confirmation of Insurance" dated January 27, 2003, evidencing payment of the default insurance premium. Ex. 33.**

**Plaintiff Huffman learned the facts constituting the fraud underlying her claims for violations of Missouri's Merchandising Practices Act after November 5, 2010, following receipt of a letter from Plaintiffs' counsel. *See* Ex. 54, at p.123-126.**

**The materials cited establish a genuine dispute of material fact as to Plaintiffs' MMPA claims and the propriety of tolling the statute of limitations. *See* Rule 56(c)(1)(A).**

**The materials cited do not establish the absence of a genuine dispute of material fact as to Plaintiffs' MMPA claims or the propriety of tolling the statute of limitations. *See* Rule 56(c)(1)(B).**

10.     Thereafter, Plaintiff Huffman stopped making payments on her loan because she could not afford it. Huffman Tr. 181:10-18.

**RESPONSE:**

**Undisputed for purposes of summary judgment that "Plaintiff Huffman stopped making payments on her loan because she could not afford it".**

**Disputed to the extent that the word "Thereafter" is construed or interpreted to have a causal relationship with Defendant's prior Fact No. 9.**

**The materials cited do not establish the absence of a genuine dispute of material fact as to Plaintiffs' MMPA claims or the propriety of tolling the statute of limitations. *See* Rule 56(c)(1)(B).**

11.     On July 12, 2004, a letter was sent to Plaintiff Huffman's correct address that indicated that she was at least ten days past due on her loan payments and informing her of her

right to cure this deficiency. *Id. at* 176:10-177:7; Huffman Notice of Right to Cure Default, attached as **Exhibit H**.

**RESPONSE: Undisputed for purposes of summary judgment.**

12.     Plaintiff Huffman does not recall taking any action to cure her default in response to the July 12, 2004 Notice. Huffman Tr. 177:8-178:20.

**RESPONSE:  Objection and Disputed.**

**The deposition testimony cited by Defendant was timely objected to by Plaintiffs during the deposition. Defendant's questioning was vague and confusing, and sought for Plaintiff to provide legal conclusions and opinions. This fact is not supported by evidence that would be admissible at trial.** *See* **Rule 56(c)(2).**

**Without waiving, and subject to their objections, Plaintiffs state the following:**

**Disputed.**

**The portion of the transcript cited indicates that Plaintiff Huffman testified she did not have a specific recollection of the letter and thus she had no specific recollection of having taken any action in response to the letter. Def.'s Ex. E. (Huffman Tr.), at p. 177:8-178:20.**

**The materials cited do not establish the absence of a genuine dispute of material fact as to Plaintiffs' MMPA claims or the propriety of tolling the statute of limitations.** *See* **Rule 56(c)(1)(B).**

13.     Plaintiff Huffman's 2003 Chevrolet Cavalier was repossessed on or about January 17, 2005. *Id.* at 179:4-13; Complaint, ¶ 28.

**RESPONSE:  Undisputed.**

14.     Plaintiff Huffman testified that she was present when her car was repossessed. Huffman Tr. 179:4-180:11.

**RESPONSE: Undisputed.**

15.     Plaintiff Huffman was sent a Pre-Sale Notice communication on or about January 17, 2005. *Id.* at 77:12-78:19; Complaint, ¶ 28; Huffman Pre-Sale Letter, attached as **Exhibit I**.

**RESPONSE: Undisputed.**

**The materials cited establish a genuine dispute of material fact as to Plaintiffs' MMPA claims and the propriety of tolling the statute of limitations. *See* Rule 56(c)(1)(A).**

**This communication stated that Plaintiffs' account balance was $19,454.96. Ex. 34. Unknown to Plaintiff, that amount was false because Defendant's own records indicated that the Plaintiff's account balance was $16,886.07 at the time of repossession. *See* Ex. 37; Ex. 6, at No. 7(f); Ex. 19, at p.49-50.**

16.     Plaintiff Huffman felt that she was harmed by the January 17, 2005 letter she received. Huffman Tr. 182:14-183:18. She indicated that the reason she was upset was because the amount owed was "higher than it should be." *Id.* at 183:19-184:1.

**RESPONSE: Objections and Disputed.**

**This "fact" violates Local Rule 56.1(a) which states "Each fact shall be set forth in a separately numbered paragraph" because there are multiple factual assertions set forth in the "fact."**

**The deposition testimony cited by Defendant was timely objected to by Plaintiffs during the deposition. Defendant's questioning was vague and confusing, and sought for Plaintiff to provide legal conclusions and opinions. This fact is not supported by evidence that would be admissible at trial. See Rule 56(c)(2).**

**Without waiving, and subject to their objections, Plaintiffs will separately address the asserted facts below.**

      **a.     Disputed.**

**The portion of the transcript cited indicates that Plaintiff Huffman testified did not have a specific recollection of the contents of the letter at the time it was sent. However, at the deposition Plaintiffs indicated that the amount set**

forth on the letter "just makes me blow up" because "it is higher than what it should be." See Def.'s Ex. E. (Huffman Tr.), at p. 182:14-184:1. Defendant has misstated Plaintiff's deposition testimony to argue that her "current" opinion of the letter is an opinion she had in 2005 when the letter was sent. The materials cited do not establish the absence of a genuine dispute of material fact as to Plaintiffs' MMPA claims or the propriety of tolling the statute of limitations. *See* Rule 56(c)(1)(B).

      **b.    Disputed.**

The portion of the transcript cited indicates that Plaintiff Huffman testified she did not have a specific recollection of the contents of the letter at the time it was sent. However, at the deposition Plaintiffs indicated that the amount set forth on the letter "just makes me blow up" because "it is higher than what it should be." See Def.'s Ex. E. (Huffman Tr.), at p. 182:14-184:1. Defendant has misstated Plaintiff's deposition testimony to argue that her "current" opinion of the letter is an opinion she had in 2005 when the letter was sent. The materials cited do not establish the absence of a genuine dispute of material fact as to Plaintiffs' MMPA claims or the propriety of tolling the statute of limitations. *See* Rule 56(c)(1)(B).

     17.    Plaintiff Huffman felt harmed in January of 2005 when her car was repossessed.

*Id.* at 73:16-76:7. Plaintiff Huffman does not recall contacting an attorney at that time. *Id.* at 76:3-8.

     **RESPONSE: Objection and Disputed.**

**This "fact" violates Local Rule 56.1(a) which states "Each fact shall be set forth in a separately numbered paragraph" because there are multiple factual assertions set forth in the "fact."**

**The deposition testimony cited by Defendant was timely objected to by Plaintiffs during the deposition. Defendant's questioning was harassing, vague and confusing, and sought for Plaintiff to provide legal conclusions and opinions. This fact is not supported by evidence that would be admissible at trial. See Rule 56(c)(2).**

**Without waiving, and subject to their objections, Plaintiffs will separately address the asserted facts below.**

     **a.    Undisputed for purposes of summary judgment that Plaintiff felt "harmed" when her motor vehicle was repossessed.**

However, this fact has no bearing on the propriety of summary judgment because it does not evidence Plaintiffs' knowledge of any facts constituting the fraud upon which her MMPA claim is premised. The materials cited do not establish the absence of a genuine dispute of material fact as to Plaintiffs' MMPA claims or the propriety of tolling the statute of limitations. *See* Rule 56(c)(1)(B).

      b.    **Undisputed for purposes of summary judgment.**

The materials cited do not establish the absence of a genuine dispute of material fact as to Plaintiffs' MMPA claims or the propriety of tolling the statute of limitations. *See* Rule 56(c)(1)(B).

18.    Plaintiff Huffman was unable to answer whether her claims in this case are "based on anything that the Credit Union of Texas did after the repossession of [her] Chevy Cavalier." *Id.* at 76:8-18.

**RESPONSE: Objection and Disputed.**

**The deposition testimony cited by Defendant was timely objected to by Plaintiffs during the deposition. Defendant's questioning was harassing, vague and confusing, sought for Plaintiff to provide legal conclusions and opinions. Further, the questioning sought to invade the attorney-client privilege. Therefore, this fact is not supported by evidence that would be admissible at trial. See Rule 56(c)(2).**

**Without waiving, and subject to their objections, Plaintiffs state the following:**

**Disputed.**

**Plaintiffs assert claims based on Defendant's conduct occurring after the repossession of Plaintiffs' motor vehicle. *See* Ex. 1, at ¶¶ 38-42, 76-86. Plaintiffs' MMPA claims also relate to Defendant's affirmative actions and misconduct designed to conceal the charges for the default and VSI insurance premiums and other fees and finance charges and Defendant's acquisition of default insurance in connection with the Plaintiffs' loans, as well as the affirmative actions and misconduct designed to conceal causes of action based upon the non-disclosure of the default and VSI insurance premiums occurring after the date of the initial sales and financing transactions. *See* Complaint (Ex. 1) at ¶¶38-42 and 81-84.**

**The materials cited do not establish the absence of a genuine dispute of material fact as to Plaintiffs' MMPA claims or the propriety of tolling the statute of limitations.** *See* **Rule 56(c)(1)(B).**

19.     Plaintiff Huffman also testified that she felt harmed in 2005 because she felt she was not given an opportunity to get her car back. *Id.* at 87:24-88:3.

**RESPONSE:**

**Disputed.**

**The portion of the transcript cited does not evidence that Plaintiff Huffman testified that she felt harmed "in 2005." See Def.'s Ex. E. (Huffman Tr.), at p. 87:24-88:3. Defendant has misstated Plaintiff's deposition testimony to argue that her "current" opinion is an opinion she had in 2005.**

**The materials cited do not establish the absence of a genuine dispute of material fact as to Plaintiffs' MMPA claims or the propriety of tolling the statute of limitations.** *See* **Rule 56(c)(1)(B).**

20.     Plaintiff Huffman never contacted Centrix or CUofT in an attempt to get her car back. *Id.* at 186:17-24.

**RESPONSE:   Undisputed for purposes of summary judgment. However, clarified that the materials cited refer to the 2005 time frame and not the present.  See Def.'s Ex. E. (Huffman Tr.), at p. 87:24-88:3.**

**The materials cited do not establish the absence of a genuine dispute of material fact as to Plaintiffs' MMPA claims or the propriety of tolling the statute of limitations.** *See* **Rule 56(c)(1)(B).**

21.     On or about March 30, 2005, Plaintiff Huffman was sent a Notice of Sale letter informing her that her car had been sold on March 23, 2005 for the amount of $4,536.75. The letter also informed Plaintiff Huffman that the deficiency balance owing on her vehicle loan was $14,338.92. *Id.* at 187:15-188:12; Huffman Notice of Sale, attached as **Exhibit J**.

**RESPONSE:  Objection.**

12

This "fact" violates Local Rule 56.1(a) which states "Each fact shall be set forth in a separately numbered paragraph" because there are multiple factual assertions set forth in the "fact."

Without waiving, and subject to their objections, Plaintiffs will separately address the asserted facts below.

      a.      Undisputed for purposes of summary judgment.

The materials cited establish a genuine dispute of material fact as to Plaintiffs' MMPA claims and the propriety of tolling the statute of limitations. *See* Rule 56(c)(1)(A).

The letter informed Plaintiff that her motor vehicle had been sold for $4,536.75 and that her deficiency balance was $14,338.92. *See* Ex. 36. Unknown to Plaintiff, these numbers were also false because, according to Defendant's internal records, it sold the Plaintiff's motor vehicle at a private auction for $5,200.00 and her deficiency was $11,420.44. Ex. 35; Ex. 6, at No. 7(e)-(g). Defendant has no explanation for the incorrect numbers set forth in the March 30, 2005 letter. Ex. 19, at p.41; *see also* p.39 (letter not accurate because "the sales price was 5,200").

Further, also unknown to Plaintiff, Defendant recovered $10,822.39 pursuant to the default insurance policy. Ex. 35; Ex. 6, at No. 7(g); Ex. 37.

      b.      Undisputed for purposes of summary judgment.

The materials cited establish a genuine dispute of material fact as to Plaintiffs' MMPA claims and the propriety of tolling the statute of limitations. *See* Rule 56(c)(1)(A).

The letter informed Plaintiff that her motor vehicle had been sold for $4,536.75 and that her deficiency balance was $14,338.92. *See* Ex. 36. Unknown to Plaintiff, these numbers were also false because, according to Defendant's internal records, it sold the Plaintiff's motor vehicle at a private auction for $5,200.00 and her deficiency was $11,420.44. Ex. 35; Ex. 6, at No. 7(e)-(g). Defendant has no explanation for the incorrect numbers set forth in the March 30, 2005 letter. Ex. 19, at p.41; *see also* p.39 (letter not accurate because "the sales price was 5,200").

Further, also unknown to Plaintiff, Defendant recovered $10,822.39 pursuant to the default insurance policy. Ex. 35; Ex. 6, at No. 7(g); Ex. 37.

22.    Plaintiff Huffman testified that she did not recall receiving any communications from Centrix Financial after March 30, 2005. Huffman Tr. 188:15-18.

**RESPONSE:  Undisputed for purposes of summary judgment.**


23.    In response to questioning by her own attorney, Plaintiff Huffman later testified that she received a letter and accompanying check for $100 from Centrix sometime around February 2006. *Id.* at 197:9-198:13; 203:20-25; *see also* **Exhibit K** (copy of a purportedly similar letter and check).

**RESPONSE:  Undisputed for purposes of summary judgment.**

**The materials cited establish a genuine dispute of material fact as to Plaintiffs' MMPA claims and the propriety of tolling the statute of limitations. *See* Rule 56(c)(1)(A).  The materials cited do not establish the absence of a genuine dispute of material fact as to Plaintiffs' MMPA claims or the propriety of tolling the statute of limitations. *See* Rule 56(c)(1)(B).**

**The testimony only evidences that the letter was misleading and concealed information from Plaintiffs because Plaintiffs simply did not appreciate the purpose Centrix sent the letter and check in the first place. Indeed, in *April Smith v. Centrix Financial, LLC, et al.*, Case No. 0516-CV-05165 (Div. 14, the Circuit Court of Jackson County, Missouri concluded that the letter "*contains misleading information, conceals material information, and constitutes an impermissible attempt to influence the putative class members' decision about whether to request exclusion from any class, in the event a class is certified under Rule 52.08(b)(3) herein.*" Ex. 52.**


24.    Plaintiff Huffman does not recall receiving any communications from CUofT after March 30, 2005. Huffman Tr. 188:19-22; 219:4-7.

**RESPONSE:  Objection and Disputed.**

**The deposition testimony cited to at  Def.'s Ex. E. (Huffman Tr.), at p. 219:4-7 indicates that Plaintiff was referring to the February 2006 letter (Def.'s Ex. K) as a subsequent communication from Defendant. Plaintiff testified in her depositions concerning her receipt of the February 2006 letter and her use of the $100.00. Ex. 54, at p.214-16.**

**At best, the materials cited establish a genuine dispute of material fact as to Plaintiffs' MMPA claims and the propriety of tolling the statute of limitations.** *See* **Rule 56(c)(1)(A).**

25.     Plaintiff Huffman testified that no one from CUofT or Centrix has contacted her since March 30, 2005 in an attempt to collect the outstanding balance on her loan. *Id.* at 188:23-189:3.

> **RESPONSE:  Objection and Disputed.**
>
> **The deposition testimony cited by Defendant was timely objected to by Plaintiffs during the deposition. Defendant's questioning was vague and confusing. This fact is not supported by evidence that would be admissible at trial. See Rule 56(c)(2).**
>
> **Without waiving, and subject to their objections, Plaintiffs state the following:**
>
> **Disputed.**
>
> **The deposition testimony cited to excludes testimony concerning the February 2006 letter because Defendant's counsel avoided any questioning concerning the February 2006 letter (Def.'s Ex. K) and thus the record was at that point unclear and potentially misleading as a result.**
>
> **The materials cited establish a genuine dispute of material fact as to Plaintiffs' MMPA claims and the propriety of tolling the statute of limitations.** *See* **Rule 56(c)(1)(A).**

26.     Plaintiff Huffman does not have the February 2006 letter and accompanying check that she allegedly received. *Id.* at Tr. 214:10-21.

> **RESPONSE:  Undisputed for purposes of summary judgment that Plaintiff does not possess the actual letter addressed to her.**
>
> **Plaintiff does, however, possess a copy of the standard form letter sent by Centrix to her and other Class members. Ex. 51. Plaintiffs also testified in their depositions concerning their receipt of the letter and their use of the $100.00. Ex. 54, at p.214-16-; Ex. 55, at p.133-137.**

15

**The materials cited do not establish the absence of a genuine dispute of material fact as to Plaintiffs' MMPA claims or the propriety of tolling the statute of limitations.** *See* **Rule 56(c)(1)(B). The materials cited establish a genuine dispute of material fact as to Plaintiffs' MMPA claims and the propriety of tolling the statute of limitations.** *See* **Rule 56(c)(1)(A).**

27.     CUofT received a default insurance payment in connection with the repossession and sale of Plaintiff Huffman's vehicle on or about May 18, 2005. Huffman Payment History, at item 42, attached as **Exhibit L**; *see also* Cooper Tr. 27:14-37:16 (all Cooper Transcript excerpts are attached as **Exhibit M**).

> **RESPONSE:  Undisputed for purposes of summary judgment.**
>
> **The materials cited establish a genuine dispute of material fact as to Plaintiffs' MMPA claims and the propriety of tolling the statute of limitations.** *See* **Rule 56(c)(1)(A).**
>
> **Defendant's recovery of insurance monies in connection with Plaintiffs' loan was unknown to Plaintiff.  Ex. 35; Ex. 6, at No. 7(g); Ex. 37;** *See* **Ex. 54, at p.123-126.**

28.     Plaintiff Huffman saw a copy of her credit report "maybe a couple of years ago," but she does not know whether her credit report contains any information related to her loan on the 2003 Cavalier. Huffman Tr. 94:20-97:13.

> **RESPONSE:  Disputed in part.   The materials cited only evidence that Plaintiff did not recall what information her credit report contained concerning her loan at the time she last saw a copy of the report.**
>
> **The materials cited establish a genuine dispute of material fact as to Plaintiffs' MMPA claims and the propriety of tolling the statute of limitations.** *See* **Rule 56(c)(1)(A).**

29.     Plaintiff Huffman has not provided a copy of her credit report to her attorney in connection with this litigation. *Id.* at 96:9-11.

> **RESPONSE:**

**Disputed.  The materials cited indicate that Plaintiff believed the question she was responding to concerned whether she gave a copy of her credit report that she saw "maybe a couple of years ago" to her attorney "a couple of years ago."**

**The materials cited establish a genuine dispute of material fact as to Plaintiffs' MMPA claims and the propriety of tolling the statute of limitations. *See* Rule 56(c)(1)(A).**

30.     In or around 2007, Plaintiff Huffman obtained financing from a used car lot and purchased a Lincoln Continental. *Id.* at 101:12-103:12.

**RESPONSE:**

**Disputed.  The materials cited indicate that Plaintiff obtained a loan where she paid "the previous owner of the car that [she] bought."Def.'s Ex. E. (Huffman Tr.), at p. 101:12-102:17.**

**The materials cited do not establish the absence of a genuine dispute of material fact as to Plaintiffs' MMPA claims or the propriety of tolling the statute of limitations. *See* Rule 56(c)(1)(B).**

31.     In or around 2009, Plaintiff Huffman purchased a Chevy Blazer, financed by Neil's Finance Plaza in Kansas City, MO. *Id.* at 104:22-105:16.

**RESPONSE:**

**Undisputed for purposes of summary judgment. The materials cited do not establish the absence of a genuine dispute of material fact as to Plaintiffs' MMPA claims or the propriety of tolling the statute of limitations. *See* Rule 56(c)(1)(B).**

32.     Plaintiff Huffman does not assert a violation of the MMPA based on any reports by Centrix or CUofT to any credit reporting agency. *See* Complaint, generally.

**RESPONSE:**

**Disputed. Plaintiffs do assert violations of the MMPA based on Defendant's credit reporting. See Ex. 1, at ¶¶41-42, 86(d).**

**The materials cited establish a genuine dispute of material fact as to Plaintiffs' MMPA claims and the propriety of tolling the statute of limitations.** *See* **Rule 56(c)(1)(A).**

33.     On or around October 2002, Plaintiff Sandler took out a loan to finance her purchase of a Mitsubishi Lancer. Sandler Tr. 73:24-74:10 (all Sandler Transcript excerpts are attached as **Exhibit N**).

**RESPONSE:  Undisputed for purposes of summary judgment.**

34.     In connection with that loan, Plaintiff Sandler executed a Retail Installment Contract and Security Agreement dated October 12, 2002. *Id.* at 94:17-96:8; Sandler Retail Installment Contract, attached as **Exhibit O**.

**RESPONSE:  Undisputed for purposes of summary judgment.**

**The materials cited establish a genuine dispute of material fact as to Plaintiffs' MMPA claims and the propriety of tolling the statute of limitations.** *See* **Rule 56(c)(1)(A).**

35.     The funding for Plaintiff Sandler's loan was provided by CUofT. *See* Answer, ¶ 5.

**RESPONSE:**

**Undisputed for purposes of summary judgment.**

**The materials cited establish a genuine dispute of material fact as to Plaintiffs' MMPA claims and the propriety of tolling the statute of limitations.** *See* **Rule 56(c)(1)(A).**

36.     CUofT purchased default and VSI insurance in connection with Plaintiff Sandler's loan on or before October 28, 2002. *See* Sandler's CUofT Funding Checklist, attached as **Exhibit P**.

**RESPONSE:**

**Objection and Disputed in part.**

**Defendant's use of the word "purchased" is vague and encompasses disputed allegations concerning the merits of Plaintiffs' MMPA claims.**

**Without waiving, and subject to their objections, Plaintiffs state.**

**Plaintiffs do not dispute that in conjunction with the Plaintiffs' loans Defendant obtained "default insurance" and other insurance protecting it from expected monetary losses caused by a borrower default. *See* Ex. 6, at No. 1; Ex. 7, at p.1; Ex. 7 at p.2; Ex. 8.**

**Defendant's citation to Exhibit P as proof of the fact is, however, disingenuous as the document is merely a checklist confirming the insurance.**

**The premiums for this insurance were directly or indirectly charged to and financed by the Plaintiffs without their knowledge. Ex. 18, at p.62; Ex. 19, at p.24, 26; Ex. 31, 40.**

**That is, in order to guarantee the insurability of each loan and to achieve a uniform 17.9% APR, the terms of each PMP loan was strictly governed by strict loan underwriting guidelines. See Ex. 9, at Recital B and §1; Ex. 10; Ex. 11, at p.1. Defendant's Lending Grid and Credit Guidelines mandated the Plaintiffs loans a "Program Rate" of a 17.9% APR and a Default Insurance Premium at 7% (later increased to 8.5%) of the amount financed (for the default insurance policy) and a uniform charge of $125.00 for the VSI policy. *See* Ex. 9, at Ex. A (CUTX005928); Ex. 12, at Declarations for Lender's Indemnity Coverage, Single Premium Rates (CUTX006052) and Loss Endorsement Rate Schedule (CUTX006058); Ex.6, at No. 1; Ex. 10, at p.1.**

**As both the credit unions' and the insurer's agent, Centrix worked closely with the auto dealers to construct the terms of each sales transaction to ensure that each "deal" fell within the credit guidelines and APR limits and would qualify for the default insurance. Ex. 13, at §3. L. The Dealer Guidelines for Missouri PMP loans expressly laid out the permitted APR on each deal, the fees that would be paid to the dealer, and the "Max. Advance" which governed the sale price of the vehicle (up to 115% of the Invoice/NADA Wholesale) and "Maximum Caps on Back-End Products Sold." Ex. 14; *see also* Ex. 16. Centrix also set forth minimum Amount Financed and term requirements for PMP loans to prevent "losing money on this type of deal." Ex. 15. The Dealer Agreements also made it clear that the Lender/credit union will only purchase loans that "satisfy specified lending criteria." Ex. 17, at Recital B and §4; Ex. 50, at §8 ("Loan Amount"); at §12 ("Program APR"); Ex. 19, at 27-28.**

19

**According to Plaintiff Sandler's standard form RISC, the "cash price" or total price of the motor vehicle was $15,012.00, and Plaintiff paid $1,000 as a down payment. Ex. 40. Based upon the disclosed "Amount Financed" of $14,012.00 and the 17.90% "Annual Percentage Rate" in the RISC, the loan required a payment of a $8,272.24 "Finance Charge" through 66 monthly payments of $337.64. Ex. 40. Based upon these figures, the internal Audit Recap sheet reflects that Defendant paid to itself $515.00 and to Centrix $3,006.96 in hidden fees and charges which were not disclosed to Plaintiff Sandler in the mandated disclosures set forth in her RISC. Compare Ex. 40 and 41, at "Centrix Fee Calculation" and "Disbursement Summary."**

**The $3,521.96 in hidden fees and charges included: (1) $1,316.02 in default insurance premiums (which was calculated as a set percentage of the Amount Financed); (2) $1,195.94, as a fee to Centrix Financial (calculated as a set percentage of the APR and monthly payment); and (3) fees totaling $515 that were ultimately paid to the motor vehicle dealer: $495.00 "acquisition fee"; $15.00 "Membership/Association Fees" and $5.00 "Share or Savings Fee." Ex. 41. Defendant's internal records also reflect a "Confirmation of Insurance" dated October 16, 2002, evidencing payment of the default insurance premium. Ex. 42.**

**Plaintiff Sandler learned the facts constituting the fraud underlying her claims for violations of Missouri's Merchandising Practices Act after November 5, 2010, following receipt of a letter from Plaintiffs' counsel. Ex. 55, at p. 45-46 ("I wasn't aware of what the Credit Union of Texas had done until I was presented with the materials for this case… I am referring to my understanding that they inflated the costs without explanation to include payment of a default insurance.").**

**The materials cited establish a genuine dispute of material fact as to Plaintiffs' MMPA claims and the propriety of tolling the statute of limitations. *See* Rule 56(c)(1)(A).**

**The materials cited do not establish the absence of a genuine dispute of material fact as to Plaintiffs' MMPA claims or the propriety of tolling the statute of limitations. *See* Rule 56(c)(1)(B).**

37.     Plaintiff Sandler's Retail Installment Contract and Security Agreement indicated that she would be responsible for 66 monthly payments of $337.64, with the initial payment being due on November 26, 2002. Sandler Retail Installment Contract; Sandler Tr. 115:1-116:12.

**RESPONSE:**

**Undisputed for purposes of summary judgment.**

**The materials cited establish a genuine dispute of material fact as to Plaintiffs' MMPA claims and the propriety of tolling the statute of limitations.** *See* **Rule 56(c)(1)(A). The materials cited do not establish the absence of a genuine dispute of material fact as to Plaintiffs' MMPA claims or the propriety of tolling the statute of limitations.** *See* **Rule 56(c)(1)(B).**

38.     Plaintiff Sandler received a payment book along with her loan documents which indicated that she would be making her loan payments to Centrix. *Id.* at 117:11-17.

**RESPONSE:**

**Undisputed for purposes of summary judgment.**

**The materials cited do not establish the absence of a genuine dispute of material fact as to Plaintiffs' MMPA claims or the propriety of tolling the statute of limitations.** *See* **Rule 56(c)(1)(B).**

39.     Thereafter, Plaintiff Sandler stopped making payments on the loan. *Id.* at 118:19-119:2.

**RESPONSE:**

**Undisputed for purposes of summary judgment that "Plaintiff Sandler stopped making payments on her loan."**

**Disputed to the extent that the word "Thereafter" is construed or interpreted to have a causal relationship with Defendant's prior Fact No. 38.**

**The materials cited do not establish the absence of a genuine dispute of material fact as to Plaintiffs' MMPA claims or the propriety of tolling the statute of limitations.** *See* **Rule 56(c)(1)(B).**

40.     Plaintiff Sandler's vehicle was repossessed on or about January 21, 2005. Complaint, ¶ 29; *see also* Sandler Tr. 124:20-127:1.

**RESPONSE:**

**Undisputed.**

41.     Plaintiff Sandler felt harmed when her vehicle was repossessed, but she did not

contact an attorney at that time. Sandler Tr. 33:24-36:23. She also testified that that harm is part

of what she is seeking damages for in this case. *Id.* at 36:21-37:1.

**RESPONSE:  Objection and Disputed.**

**This "fact" violates Local Rule 56.1(a) which states "Each fact shall be set
forth in a separately numbered paragraph" because there are multiple
factual assertions set forth in the "fact."**

**Without waiving, and subject to their objections, Plaintiffs will separately
address the asserted facts below.**

**a.      Undisputed for purposes of summary judgment that Plaintiff felt
"harmed" when her motor vehicle was repossessed. However, this fact has no
bearing on the propriety of summary judgment because it does not evidence
Plaintiffs' knowledge of any facts constituting the fraud upon which her
MMPA claim is premised. The materials cited do not establish the absence of
a genuine dispute of material fact as to Plaintiffs' MMPA claims or the
propriety of tolling the statute of limitations. *See* Rule 56(c)(1)(B).**

**b.      Undisputed for purposes of summary judgment. The materials cited
do not establish the absence of a genuine dispute of material fact as to
Plaintiffs' MMPA claims or the propriety of tolling the statute of limitations.
*See* Rule 56(c)(1)(B).**

42.     Plaintiff Sandler was sent a pre-sale notice communication on or about January

21, 2005. *Id.* at 124:20-125:11, Sandler Pre-Sale Notice, attached as **Exhibit Q**; Complaint, ¶ 29.

**RESPONSE:**

**Undisputed for purposes of summary judgment.**

**The materials cited establish a genuine dispute of material fact as to
Plaintiffs' MMPA claims and the propriety of tolling the statute of
limitations. *See* Rule 56(c)(1)(A).**

**This communication stated that Plaintiffs' account balance was $12,485.99.
Ex. 43. Unknown to Plaintiff, that amount was false because Defendant's**

**own records indicated that the Plaintiff's account balance was $11,721.46 at the time of repossession. Ex. 19, at p.63; Ex. 46; Ex. 6, at No. 7(f).**

43.     On March 31, 2005, Plaintiff Sandler was sent a Notice of Sale letter notifying her that her car had been sold. Sandler Tr. 37:22-40:9; Sandler Notice of Sale, attached as **Exhibit R**. The letter also informed her of the amount the car was sold for and the deficiency balance remaining on her loan. Sandler Tr. 127:6-20; *see also* Sandler Notice of Sale.

**RESPONSE: Objection.**

**This "fact" violates Local Rule 56.1(a) which states "Each fact shall be set forth in a separately numbered paragraph" because there are multiple factual assertions set forth in the "fact."**

**Without waiving, and subject to their objections, Plaintiffs will separately address the asserted facts below.**

**a.     Undisputed for purposes of summary judgment.**

**The materials cited establish a genuine dispute of material fact as to Plaintiffs' MMPA claims and the propriety of tolling the statute of limitations. *See* Rule 56(c)(1)(A).**

**The March 30th letter informed Plaintiff that her motor vehicle had been sold for $530.00 and that her deficiency balance was $11,470.74. *See* Ex. 45. Unknown to Plaintiff, these numbers were also false, because, according to Defendant's internal records, it sold the Plaintiff's motor vehicle at a private auction for $3,000.00 and her deficiency was $10,529.68. Ex. 44; Ex. 6, at No. 7(e)-(g).  Defendant has no explanation for the incorrect numbers set forth in the March 31, 2005 letter. Ex. 19, at p.52-54.**

**Further, also unknown to Plaintiff, Defendant recovered $7,763.96 pursuant to the default insurance policy.  Ex. 44; Ex. 6, at No. 7(g); Ex. 46.**

**b.     Undisputed for purposes of summary judgment.**

**The materials cited establish a genuine dispute of material fact as to Plaintiffs' MMPA claims and the propriety of tolling the statute of limitations. *See* Rule 56(c)(1)(A).**

**The March 30th letter informed Plaintiff that her motor vehicle had been sold for $530.00 and that her deficiency balance was $11,470.74.** *See* **Ex. 45. Unknown to Plaintiff, these numbers were also false, because, according to Defendant's internal records, it sold the Plaintiff's motor vehicle at a private auction for $3,000.00 and her deficiency was $10,529.68. Ex. 44; Ex. 6, at No. 7(e)-(g). Defendant has no explanation for the incorrect numbers set forth in the March 31, 2005 letter. Ex. 19, at p.52-54.**

**Further, also unknown to Plaintiff, Defendant recovered $7,763.96 pursuant to the default insurance policy. Ex. 44; Ex. 6, at No. 7(g); Ex. 46.**

44.     Plaintiff Sandler felt harmed by the March 2005 Notice of Sale letter. Sandler Tr. 46:17-22; 127:24-128:4. In particular, Plaintiff Huffman testified that she felt harmed because her car was sold for only $530, leaving her with a deficiency of more than $11,000. *Id.* at 127:24- 128:4.

**RESPONSE:  Objection and disputed.**

**This "fact" violates Local Rule 56.1(a) which states "Each fact shall be set forth in a separately numbered paragraph" because there are multiple factual assertions set forth in the "fact."**

**Without waiving, and subject to their objections, Plaintiffs will separately address the asserted facts below.**

  **a.     Disputed.**

**The portions of the transcript cited indicates that Plaintiff Sandler testified that "she did not believe that the car was sold for only $530 leaving a balance of 11,000 left."    See Def.'s Ex. N. (Sandler Tr.), at p. 127:24- 128:4. Defendant has misstated Plaintiff's deposition testimony to argue that her "current" opinion of the letter is an opinion she had in 2005 when the letter was sent.**

**The materials cited do not establish the absence of a genuine dispute of material fact as to Plaintiffs' MMPA claims or the propriety of tolling the statute of limitations.** *See* **Rule 56(c)(1)(B).**

  **b.     Disputed.**

**The portions of the transcript cited indicates that Plaintiff Sandler testified that "she did not believe that the car was sold for only $530 leaving a balance**

of 11,000 left." See Def.'s Ex. N. (Sandler Tr.), at p. 127:24- 128:4. Defendant has misstated Plaintiff's deposition testimony to argue that her "current" opinion of the letter is an opinion she had in 2005 when the letter was sent.

The materials cited do not establish the absence of a genuine dispute of material fact as to Plaintiffs' MMPA claims or the propriety of tolling the statute of limitations. *See* Rule 56(c)(1)(B).

45.     Plaintiff Sandler did not attempt to contact an attorney after receiving the March 31, 2005 letter. *Id.* at 46:17-22.

**RESPONSE: Undisputed for purposes of summary judgment.**

The materials cited do not establish the absence of a genuine dispute of material fact as to Plaintiffs' MMPA claims or the propriety of tolling the statute of limitations. *See* Rule 56(c)(1)(B).

46.     Plaintiff Sandler testified that, in or around February 2006, she received a letter with a check for $100 from Centrix. *Id.* at 133:15-137:22; *see also* **Exhibit K** (copy of purportedly similar letter and check).

**RESPONSE:**

**Undisputed for purposes of summary judgment.**

The materials cited establish a genuine dispute of material fact as to Plaintiffs' MMPA claims and the propriety of tolling the statute of limitations. *See* Rule 56(c)(1)(A). The materials cited do not establish the absence of a genuine dispute of material fact as to Plaintiffs' MMPA claims or the propriety of tolling the statute of limitations. *See* Rule 56(c)(1)(B).

The testimony only evidences that the letter was misleading and concealed information from Plaintiffs because Plaintiffs simply did not appreciate the purpose Centrix sent the letter and check in the first place. Indeed, in *April Smith v. Centrix Financial, LLC, et al.*, Case No. 0516-CV-05165 (Div. 14, the Circuit Court of Jackson County, Missouri concluded that the letter "*contains misleading information, conceals material information, and constitutes an impermissible attempt to influence the putative class members'*

***decision about whether to request exclusion from any class, in the event a class is certified under Rule 52.08(b)(3) herein.*** **Ex. 52.**

47.　　When asked if she read the February 2006 letter she allegedly received from Centrix, Plaintiff Sandler replied: "I probably did, but was so excited about page 2 [the check] that I didn't read – do you know what I'm saying? It was like, let's go to the bank and then go out to eat." Sandler Tr. 134:17-23.

**RESPONSE:**

**Undisputed for purposes of summary judgment.**

**The materials cited establish a genuine dispute of material fact as to Plaintiffs' MMPA claims and the propriety of tolling the statute of limitations.** *See* **Rule 56(c)(1)(A). The materials cited do not establish the absence of a genuine dispute of material fact as to Plaintiffs' MMPA claims or the propriety of tolling the statute of limitations.** *See* **Rule 56(c)(1)(B).**

**The testimony only evidences that the letter was misleading and concealed information from Plaintiffs because Plaintiffs simply did not appreciate the purpose Centrix sent the letter and check in the first place. Indeed, in *April Smith v. Centrix Financial, LLC, et al.*, Case No. 0516-CV-05165 (Div. 14, the Circuit Court of Jackson County, Missouri concluded that the letter "*contains misleading information, conceals material information, and constitutes an impermissible attempt to influence the putative class members' decision about whether to request exclusion from any class, in the event a class is certified under Rule 52.08(b)(3) herein.*" Ex. 52.**

48.　　Plaintiff Sandler has not been able to locate a copy of the $100 check she claims to have cashed. *Id.* at 133:15-137:6.

**RESPONSE: Undisputed for purposes of summary judgment that Plaintiff does not possess the actual letter addressed to her.**

**Plaintiff does, however, possess a copy of the standard form letter sent by Centrix to her and other Class members. Ex. 51. Plaintiffs also testified in their depositions concerning their receipt of the letter and their use of the $100.00. Ex. 54, at p.214-16-; Ex. 55, at p.133-137.**

26

**The materials cited do not establish the absence of a genuine dispute of material fact as to Plaintiffs' MMPA claims or the propriety of tolling the statute of limitations. *See* Rule 56(c)(1)(B). The materials cited establish a genuine dispute of material fact as to Plaintiffs' MMPA claims and the propriety of tolling the statute of limitations. *See* Rule 56(c)(1)(A).**

49.    CUofT received a VSI insurance payment in connection with Plaintiff Sandler's loan on or about February 18, 2005. Sandler Payment History, at item 32, attached as **Exhibit S.**

**RESPONSE:**

 **Undisputed for purposes of summary judgment.**

**The materials cited establish a genuine dispute of material fact as to Plaintiffs' MMPA claims and the propriety of tolling the statute of limitations. *See* Rule 56(c)(1)(A). The materials cited do not establish the absence of a genuine dispute of material fact as to Plaintiffs' MMPA claims or the propriety of tolling the statute of limitations. *See* Rule 56(c)(1)(B).**

**Defendant's recovery of insurance monies in connection with Plaintiffs' loan was unknown to Plaintiff.  Ex. 44; Ex. 6, at No. 7(g); Ex. 46.**

50.    CUofT received a default insurance payment in connection with the repossession and sale of Plaintiff Sandler's vehicle on or about May 18, 2005. *Id.* at item 35; *see also* Cooper Tr. 51:2-56:2.

**RESPONSE:**

**Undisputed for purposes of summary judgment.**

**The materials cited establish a genuine dispute of material fact as to Plaintiffs' MMPA claims and the propriety of tolling the statute of limitations. *See* Rule 56(c)(1)(A). The materials cited do not establish the absence of a genuine dispute of material fact as to Plaintiffs' MMPA claims or the propriety of tolling the statute of limitations. *See* Rule 56(c)(1)(B).**

**Defendant's recovery of insurance monies in connection with Plaintiffs' loan was unknown to Plaintiff.  Ex. 44; Ex. 6, at No. 7(g); Ex. 46.; Ex. 55, at p. 45-46 ("I wasn't aware of what the Credit Union of Texas had done until I was**

presented with the materials for this case… I am referring to my understanding that they inflated the costs without explanation to include payment of a default insurance.").

51.     Plaintiff Sandler was unable to provide an answer when she was asked: "Did you feel harmed by anything that Centrix did after March 31st, 2005?" Sandler Tr. 129:24-132:19.

**RESPONSE:  Objection and Disputed.**

**The deposition testimony cited by Defendant was timely objected to by Plaintiffs during the deposition. Defendant's questioning was harassing, vague and confusing, sought for Plaintiff to provide legal conclusions and opinions.   Further, the questioning sought to invade the attorney-client privilege. This fact is not supported by evidence that would be admissible at trial. See Rule 56(c)(2).**

**Without waiving, and subject to their objections, Plaintiffs state the following:**

**Plaintiffs assert claims based on Defendant's conduct occurring after the repossession of Plaintiffs' motor vehicle.  See Ex. 1, at ¶¶ 38-42, 76-86. Plaintiffs' MMPA claims also relate to Defendant's affirmative actions and misconduct designed to conceal the charges for the default and VSI insurance premiums and other fees and finance charges and Defendant's acquisition of default insurance in connection with the Plaintiffs' loans, as well as the affirmative actions and misconduct designed to conceal causes of action based upon the non-disclosure of the default and VSI insurance premiums occurring after the date of the initial sales and financing transactions.  See Complaint (Ex. 1) at ¶¶38-42 and 81-84.**

**The materials cited do not establish the absence of a genuine dispute of material fact as to Plaintiffs' MMPA claims or the propriety of tolling the statute of limitations. See Rule 56(c)(1)(B).**

52.     Plaintiff Sandler has not seen a copy of her credit report since her car was repossessed, nor has she tried to obtain a copy of her credit report. *Id.* at 138:16-140:5.

**RESPONSE:**

**Undisputed for purposes of summary judgment.**

**The materials cited do not establish the absence of a genuine dispute of material fact as to Plaintiffs' MMPA claims or the propriety of tolling the statute of limitations.** *See* **Rule 56(c)(1)(B).**

53.     Plaintiff Sandler has not alleged an MMPA violation based on the reporting of any information by Centrix or CUofT to any credit reporting agencies. *See* Complaint, generally.

**RESPONSE:**

**Disputed. Plaintiffs do assert violations of the MMPA based on Defendant's credit reporting. See Ex. 1, at ¶¶41-42, 86(d).**

**The materials cited establish a genuine dispute of material fact as to Plaintiffs' MMPA claims and the propriety of tolling the statute of limitations.** *See* **Rule 56(c)(1)(A).**

54.     CUofT has not made any attempts to collect the deficiency amounts from either Plaintiff. Cooper Tr., Vol. 2, 86:15-88:10.

**RESPONSE:**

**Undisputed for purposes of summary judgment.**

**The materials cited do not establish the absence of a genuine dispute of material fact as to Plaintiffs' MMPA claims or the propriety of tolling the statute of limitations.** *See* **Rule 56(c)(1)(B).**

55.     CUofT did not instruct Centrix to collect on the deficiency amounts at issue in this lawsuit. *Id.*

**RESPONSE:**

**Undisputed for purposes of summary judgment.**

**The materials cited do not establish the absence of a genuine dispute of material fact as to Plaintiffs' MMPA claims or the propriety of tolling the statute of limitations.** *See* **Rule 56(c)(1)(B).**

## II. ADDITIONAL UNDISPUTED FACTS PRECLUDING THE ENTRY OF SUMMARY JUDGMENT IN FAVOR OF DEFENDANT

### A. Defendant's Underwriting Guidelines Contained a Mechanism to Disguise and Conceal Charges for Default and VSI Insurance Premiums to Be Paid and Financed by Plaintiffs.

1. In late 2001, Defendant became involved with a now-defunct third party called Centrix Financial, LLC ("Centrix") in an investment program for credit unions called the "Portfolio Management Program" ("PMP"). **Ex. 6**, at No. 1; **Ex. 7**, at p.1.

2. The PMP targeted persons who were in need of financing but who were, due to their poor or "impaired" credit, disqualified from conventional or "prime" financing. **Ex. 6**, at No. 1; **Ex. 7**, at p.1-2; **Ex. 16,** at Huffman 0000776.

3. The PMP promised credit unions a rate of return which was substantially higher than that of prime auto loans, with little or no risk of monetary loss, with little oversight of Centrix's operations and servicing of the loans. **Ex. 7** at p.2 ("The Centrix program helps members with impaired credit; therefore, the yield on these loans is higher. However, with the insurance, these loans act and feel like prime loans.").

4. In conjunction with each loan Defendant obtained "default insurance" and other insurance protecting it from expected monetary losses caused by a borrower default. *See* **Ex. 6**, at No. 1 ("The PMP enabled a credit union to provide financing for the purchase of an automobile to a credit-impaired borrower by shifting to insurers a portion of the risk of default."); **Ex. 7**, at p.1 ("This program is an innovative and turnkey process that enables CUofTX to safely provide auto loans to credit impaired members. As part of the PMP, Centrix markets, underwrites, packages, and insured against principal loss on each PMP loan.")**; Ex. 7** at p.2 ("The risk of default is the principal concern with sub-prime loans."); **Ex. 8** ("The program is designed to help credit impaired members obtain auto financing. The loans are insured against principal loss").

5.      In order to guarantee the insurability of each PMP loan and to achieve a 17.9%

APR, the terms of each PMP loan were strictly governed by the underwriting guidelines set forth

in the *Standard Loan Placement Agreement* and in *Dealer Agreements* between Centrix and the

auto dealers. *See generally* **Ex. 9-17.**

6.      For example, the Standard Loan Placement Agreement stated:

"loans presented to the Lender by Centrix will be in accordance with the provisions of this Agreement and the Lender's Sub-Prime Credit Guidelines" and "Lender has reviewed, examined and approves of the materials and documents used in the Loan program, including the funding package and Lending Grids, which reflect the Credit Guidelines."

**Ex. 9**, at Recital B and §1; **Ex. 10.**

7.      The "Credit Union Approval of Sub-Prime Credit Guidelines" in turn stated:

"The Credit Guidelines also form the basis upon which the GAP default insurance is provided for each PMP loan. Therefore, because the GAP insurance policy is only provided when Centrix's Credit Guidelines are used for underwriting the loans, the credit union cannot change the Centrix Credit Guidelines. The Credit Guidelines must be approved and implemented by the credit union without any changes or modifications. Please see the Due Diligence Binder for the actual Credit Guidelines."

**Ex. 11**, at p.1.

8.      The Lending Grid and Credit Guidelines attached to the Loan Placement

Agreement mandated for the "Premium Plus" loans at issue in this lawsuit a "Program Rate" of a

17.9% APR and a Default Insurance Premium at 7% (later increased to 8.5%) of the amount

financed (for the default insurance policy) and a uniform charge of $125.00 for the VSI policy:

| Centrix Rate Participation Default Insurance Premiums Dealer Discounts and Acquisition Fees | | | | | |
|---|---|---|---|---|---|
| Program | Optima | Premium | Advantage | Premium Plus | FTB |
| Program Rate** | 14.9% | 17.9% | 17.9% | 17.9% | 17.9% |
| Centrix Rate Participation** | [4%] | [5%] | [5%] | [5%] | [5%] |
| Default *Insurance Premium | [3%] of amount financed + $125 | [7%] of amount financed + $125 | [7%] of amount financed + $125 | [7%] of amount financed + $125 | [7%] of amount financed + $125 |

*See* **Ex. 9**, at Ex. A (CUTX005928); **Ex. 12**, at Declarations for Lender's Indemnity Coverage, Single Premium Rates (CUTX006052) and Loss Endorsement Rate Schedule (CUTX006058); **Ex.6**, at No. 1 ("In the LPA, Defendant adopted the PMP Underwriting Guidelines required by the DPI insurer and authorized Centrix Financial to use those guidelines in underwriting loans." and "if Defendant accepted the loan package, it would fund the loan and, in addition, would pay the associated fees and insurance premiums.""); **Ex. 10**, at p.1 ("individuals entering the member's application data, with regard to these Guidelines, have no authority to exercise any judgment regarding this information; and thus, the result will reflect the Credit Union's lending policies.").

9.     As both the credit unions' and the insurer's agent, Centrix worked closely with the auto dealers to construct the terms of each sales transaction to ensure that each "deal" fell within the credit guidelines and APR limits and would qualify for the default insurance. **Ex. 13-17.**

10.     For example, the procedures for "Loan Application/Contract/Funding" state that "Centrix Representatives establish relationships with auto dealers in regions served by participating credit unions" and "Centrix representatives contact auto dealers to generate applications that are suitable for funding by credit unions participating in the Centrix PMP" and

that "Centrix's automated systems and/or Underwriter evaluate applications and can approve or deny applications" that "meet the Credit Guidelines." **Ex. 13**, at §3. L.

11.     Similarly, the Dealer Guidelines for Missouri PMP loans expressly laid out the permitted APR on each deal, the fees that would be paid to the dealer, and the "Max. Advance" which governed the sale price of the vehicle (up to 115% of the Invoice/NADA Wholesale) and "Maximum Caps on Back-End Products Sold:"

| | Optima<br>14.90%<br>Dealer paid 2% of amt financed | Premium Plus<br>17.90% |
|---|---|---|
| | **Optima** | **Premium Plus** |
| Acq. Fee: | $100 | $495 |
| Loan Minimum: | $10,000 | $12,000 |
| Loan Maximum: | $30,000 | $30,000 |
| Max. Advance: | up to 115% of Invoice/NADA Wholesale | up to 115% of Invoice/NADA Wholesale |
| T T & L: | All applicable tax, title and licence fees. | All applicable tax, title and licence fees. |
| Credit Insurance: | CLA&H | CLA&H |
| All Warranty: | up to $2,000 | up to $2,000 |
| GAP: | $500 Maximum | $500 Maximum |
| D&H: | $300 Maximum | $300 Maximum |

**Ex. 14;** *see also* **Ex. 16** ("The Centrix Solution: "Centrix's multiple credit programs have been designed to cover a range of credit histories and clearly lay out requirements, enabling you to predict the potential for an application and the corresponding APR.").

12.     Centrix also set forth minimum Amount Financed and term requirements for PMP loans to prevent "losing money on this type of deal." **Ex. 15.**

13.     The Dealer Agreements also make clear that the Lender/credit union will only purchase loans that "satisfy specified lending criteria" and that the "default insurance, facilitates the sale to participating Lenders of Contracts that are made by purchasers with impaired credit." **Ex. 17,** at Recital B and §4; **Ex. 50**, at §8 ("Loan Amount"); at §12 ("Program APR"); **Ex. 19**, at 127-28 ("These are the guidelines that were provided to the dealer by Centrix. When the deal

came in from the dealer Centrix would look at the guidelines to ensure that they met their criteria.").

14.     There were no disclosures made to the Class Members concerning the purchase of this insurance, or the hidden fees and finance charges paid to the auto dealer and Centrix pursuant to the Credit Guidelines. **Ex. 18**, at p.62; **Ex. 19**, at p.24, 26; **Ex. 31, 40**.

15.     Pursuant to the terms of the Portfolio Servicing Agreement, Centrix "serviced" the loans for the credit unions, which included the mailing of monthly loan statements, execution of repossessions for Defendant, the mailing of "pre-sale" and "post-sale" communications governed by Missouri law, and the processing of default insurance claims for the Defendant. **Ex. 20**, at, *e.g.*, §§2.22(a); 2.1, 2.16; *see also* **Ex. 21** ("GAP Insurance Policy Filing and Tracking").

**B.      Defendant Disclaimed Any Responsibility to Ensure that its Loans Complied with the Disclosure Requirements of Federal and/or Missouri State Law.**

16.     Defendant did not scrutinize or monitor Centrix or the dealers involved in the motor vehicle sales transactions to ensure that the loans or "deals" were conducted in compliance with state or federal law or that the loan servicing was conducted in compliance with the law. **Ex. 18,** at p.64.

17.     Defendant disclaimed any responsibility or obligation to scrutinize or monitor Centrix or the dealers involved in the motor vehicle sales transactions to ensure that the loans or "deals" were conducted in compliance with state or federal law or that the loan servicing was conducted in compliance with the law.  **Ex. 18,** at p.64.

18.     Instead, Defendant merely requested annual "Certificates of Compliance" from Centrix representing that Centrix's servicing was being conducted in compliance with the Portfolio Servicing Agreement.  **Ex. 19**, at 27, 40; **Ex. 22.**

### C. Facts Giving Rise to Plaintiff Huffman's Claims

19.     On or about January 10, 2003 Plaintiff Elaine Huffman purchased a Chevrolet Cavalier from Van Chevrolet Cadillac in Kansas City, Missouri. **Ex. 31**.

20.     According to her standard form RISC, the "cash price" or total price of the motor vehicle was $21,641.93, and Plaintiff paid $4,231.47 as a down payment through the trade in of her vehicle and other rebates. **Ex. 31.**

21.     Plaintiff Huffman's poor credit rating at the time disqualified her from "prime" financing but, as an internal "Audit Recap" sheet reflects, qualified her for "Premium Plus" subprime financing through the PMP. **Ex. 32**, at "Centrix Program Information."

22.     Based upon the disclosed "Amount Financed" of $18,705.46 and the 17.90% "Annual Percentage Rate" in the RISC, the loan required a payment of a $10,822.94 "Finance Charge" through 66 monthly payments of $447.40. **Ex. 31.**

23.     Based upon these figures, the internal Audit Recap sheet reflects that Defendant paid to itself $665.00 and to Centrix $3,958.20 in fees and charges which were not disclosed to Plaintiff Huffman in the mandated disclosures set forth in her RISC:

| Centrix Program Information | | | | |
|---|---|---|---|---|
| **Insurance Calculation:** | | | **Centrix Fee Calculation:** | |
| Amount Financed: | | $18,705.46 | *Program Monthly Payment: | $447.41 |
| Insurance Percentage: | x | 8.50% | Effective Monthly Payment: - | $397.21 |
| Insurance Rate: | = | $1,589.96 | Payment Difference: | $50.20 |
| Insurance Fee: | + | $125.00 | Effective Term / Cap: x | 66.0 |
| Insurance Premium: | = | $1,714.96 | Centrix Rate Participation: = | $3,313.20 |
| **Program Values:** | | | | |
| Program: | | Centrix Premium Plus | Centrix Rate Participation: | $3,313.20 |
| Program APR: | | 17.90 % | Insurance Premium: - | $1,714.96 |
| Effective APR: | | 12.90 % | Centrix Fee: = | $1,598.24 |
| Spread: | | 5 % | | |
| Discount: | | $0.00 | | |

*Compare* **Ex. 31** and **32**, at "Centrix Fee Calculation" and "Disbursement Summary."

24.     The $4,623.30 in undisclosed fees and charges included: (1) $1,714.96 in default insurance premiums (which was calculated as a set percentage of the Amount Financed); (2)

35

$1,598.24, as a fee to Centrix Financial (calculated as a set percentage of the APR and monthly payment); and (3) the following fees totaling $665 that were ultimately paid to the motor vehicle dealer: $150.00 "admin fee;" $495.00 "acquisition fee" and $15.00 "Membership/Association Fees":

**Ex. 32**.

25.     Defendant's internal records also reflect a "Confirmation of Insurance" dated January 27, 2003, evidencing payment of the default insurance premium. **Ex. 33.**

26.     Plaintiff Huffman's loan payment history evidences a number of payments on her motor vehicle loan that were applied to both outstanding principal and interest.  **Ex. 37**.

27.     Plaintiff Huffman's Charge-Off Report evidences that there was a $1,819.39 Principal Reduction based upon her payments on the vehicle loan. **Ex. 35.**

28.     In 2004, after having made a number of full or partial payments, Plaintiff fell into default on her motor vehicle loan.  **Ex. 34, 37**.

29.     In January 2005, Defendant repossessed Plaintiffs' motor vehicle.  **Ex. 34, 37.**

30.     On or about January 17, 2005, Defendant, through its servicing agent Centrix, sent to the Plaintiff a standard form, computer generated "pre-sale" communication which stated that her account balance was $19,454.96. **Ex. 34.**

36

31.     Unknown to Plaintiff, that amount was false because Defendant's own records indicated that the Plaintiff's account balance was $16,886.07 at the time of repossession. *See* **Ex. 37; Ex. 6**, at No. 7(f); **Ex. 19**, at p.49-50.

32.     On or about March 30, 2005, Defendant notified Plaintiff by letter that her motor vehicle had been sold for $4,536.75 and that her deficiency balance was $14,338.92. *See* **Ex. 36.**

33.     Also unknown to Plaintiff, these numbers were also false because, according to Defendant's internal records, it sold the Plaintiff's motor vehicle at a private auction for $5,200.00 and her deficiency was $11,420.44.  **Ex. 35; Ex. 6**, at No. 7(e)-(g).

34.     Defendant has no explanation for the incorrect numbers set forth in the March 30, 2005 letter. **Ex. 19,** at p.41; *see also* p.39 (letter not accurate because "the sales price was 5,200").

35.     In connection with the PMP, and also unknown to Plaintiff, Defendant recovered $10,822.39 pursuant to the default insurance policy.  **Ex. 35; Ex. 6**, at No. 7(g); **Ex. 37**.

**D.     Facts Giving Rise to Plaintiff Sandler's Claims**

36.     On or about October 12, 2002 Plaintiff Charlene Sandler purchased a Mitsubishi Lancer from Lou Fusz Chevrolet in St. Louis, Missouri. **Ex. 40**.

37.     According to her standard form RISC, the "cash price" or total price of the motor vehicle was $15,012.00, and Plaintiff paid $1,000 as a down payment. **Ex. 40.**

38.     Plaintiff Sandler's poor credit rating at the time disqualified her from "prime" financing but, as an internal "Audit Recap" sheet reflects, qualified her for "Premium Plus" subprime financing through the PMP. **Ex. 41**, at "Centrix Program Information."

39. Based upon the disclosed "Amount Financed" of $14,012.00 and the 17.90% "Annual Percentage Rate" in the RISC, the loan required a payment of a $8,272.24 "Finance Charge" through 66 monthly payments of $337.64. **Ex. 40.**

40. Based upon these figures, the internal Audit Recap sheet reflects that Defendant paid to itself $515.00 and to Centrix $3,006.96 in hidden fees and charges which were not disclosed to Plaintiff Sandler in the mandated disclosures set forth in her RISC:

| Centrix Program Information | | | | |
|---|---|---|---|---|
| **Insurance Calculation:** | | | **Centrix Fee Calculation:** | |
| Amount Financed: | | $14,012.00 | *Program Monthly Payment: | $337.47 |
| Insurance Percentage: | x | 8.50% | Effective Monthly Payment: - | $299.41 |
| Insurance Rate: | = | $1,191.02 | Payment Difference: = | $38.06 |
| Insurance Fee: | + | $125.00 | Effective Term / Cap: x | 66.0 |
| Insurance Premium: | = | $1,316.02 | Centrix Rate Participation: = | $2,511.96 |
| **Program Values** | | | | |
| Program: | | Centrix Premium Plus | Centrix Rate Participation: | $2,511.96 |
| Program APR: | | 17.90 % | Insurance Premium: - | $1,316.02 |
| Effective APR: | | 12.90 % | Centrix Fee: = | $1,195.94 |
| Spread: | | 5 % | | |
| Discount: | | $0.00 | *Revised* | |

Compare **Ex. 40** and **41**, at "Centrix Fee Calculation" and "Disbursement Summary."

41. The $3,521.96 in hidden fees and charges included: (1) $1,316.02 in default insurance premiums (which was calculated as a set percentage of the Amount Financed); (2) $1,195.94, as a fee to Centrix Financial (calculated as a set percentage of the APR and monthly payment); and (3) fees totaling $515 that were ultimately paid to the motor vehicle dealer: $495.00 "acquisition fee"; $15.00 "Membership/Association Fees" and $5.00 "Share or Savings Fee":

| Disbursement Summary | | | |
|---|---|---|---|
| **Dealer Disbursement:** | | **Centrix Disbursement:** | |
| Amount Financed: | $14,012.00 | Centrix Fee: | $1,195.94 |
| Discount: - | $0.00 | Membership Fee: - | $0.00 |
| Acquisition Fee: - | $495.00 | Share or Savings Fee: - | $0.00 |
| Membership Fees: - | $15.00 | Not Used: - | $0.00 |
| Share or Savings Fe - | $5.00 | Not Used: - | $0.00 |
| Overadvances: - | $0.00 | | |
| Term Fees: - | $0.00 | State Fee : - | $0.00 |
| Doc Stamp Fee: - | $0.00 | Participation: - | $0.00 |
| | | Total Deductions: = | $0.00 |
| Total Deductions: = | $515.00 | Total After Deductions: = | $1,195.94 |
| Total After Deductions: = | $13,497.00 | Other: + | $0.00 |
| Participation: + | $0.00 | Discount: + | $0.00 |
| | | Acquisition Fee: + | $495.00 |
| | | Insurance Premium: + | $1,316.02 |
| **Net To Dealer:** = | **$13,497.00** | **Total To Centrix:** = | **$3,006.96** |

**Ex. 41.**

42.     Defendant's internal records also reflect a "Confirmation of Insurance" dated October 16, 2002, evidencing payment of the default insurance premium. **Ex. 42.**

43.     Plaintiff Sandler's loan payment history evidences a number of payments on her motor vehicle loan that were applied to both outstanding principal and interest.  **Ex. 46.**

44.     Plaintiff Sandler's Charge-Off Report evidences that there was a $2,290.54 Principal Reduction based upon her payments on the vehicle loan. **Ex. 44**.

45.     In 2004, after having made a number of full or partial payments, Plaintiff fell into default on her motor vehicle loan.  **Ex. 43, 46**.

46.     In January 2005, Defendant repossessed Plaintiffs' motor vehicle.  **Ex. 43, 46.** On or about January 21, 2005, Defendant, through its servicing agent Centrix, sent to the Plaintiff a standard form, computer generated "pre-sale" communication which stated that her account balance was $12,485.99 **Ex. 43.**

47.     Unknown to Plaintiff, that amount was false because Defendant's own records indicated that the Plaintiff's account balance was $11,721.46 at the time of repossession. **Ex. 19**, at p.63; **Ex. 46; Ex. 6**, at No. 7(f).

48.     On or about March 31, 2005, Defendant notified Plaintiff by letter that her motor vehicle had been sold for $530.00 and that her deficiency balance was $11,470.74. *See* **Ex. 45.**

49.     Also unknown to Plaintiff, these numbers were also false, because, according to Defendant's internal records, it sold the Plaintiff's motor vehicle at a private auction for $3,000.00 and her deficiency was $10,529.68. **Ex. 44; Ex. 6**, at No. 7(e)-(g).

50.     Defendant has no explanation for the incorrect numbers set forth in the March 31, 2005 letter. **Ex. 19**, at p.52-54.

51.     In connection with the PMP, and also unknown to Plaintiff, Defendant recovered $7,763.96 pursuant to the default insurance policy.  **Ex. 44; Ex. 6**, at No. 7(g); **Ex. 46**.

**E.      Plaintiffs' Discovery of Facts Constituting the Fraud Underlying their MMPA Claims.**

52.     Plaintiff Huffman learned the facts constituting the fraud underlying her claims for violations of Missouri's Merchandising Practices Act after November 5, 2010, following receipt of a letter from Plaintiffs' counsel.  *See* **Ex. 54**, at p.123-126.

53.     Plaintiff Sandler learned the facts constituting the fraud underlying her claims for violations of Missouri's Merchandising Practices Act after November 5, 2010, following receipt of a letter from Plaintiffs' counsel. **Ex. 55**, at p. 45-46 ("I wasn't aware of what the Credit Union of Texas had done until I was presented with the materials for this case…  I am referring to my understanding that they inflated the costs without explanation to include payment of a default insurance.").

**F.      Defendant's Misconduct Occurring After the Plaintiffs' Initial Sales and Financing Transactions**

54.     Centrix and Midwest United Credit Union were sued in February 2005 in the Circuit Court of Jackson County, Missouri in *April Smith v. Centrix Financial, LLC, et al.*, Case

No. 0516-CV-05165 (Div. 14, Circuit Court of Jackson County, Missouri) for violations of the Commercial Code related to the pre-sale communications sent to Midwest United Credit Union's PMP borrowers, and the action was certified as a class action by way of an Order dated June 13, 2006. **Ex. 4**.

55. Following a stay of the proceedings during Centrix's bankruptcy, during which Centrix was dismissed as a defendant, the Circuit Court of Jackson County denied the credit union's attempt to decertify the *April Smith* class action. **Ex. 5**.

56. In February 2006, Centrix sent each of the Plaintiffs a letter with a $100.00 checks. **Ex. 51; Ex. 54**, at p.210, 214, **Ex. 55**, at p.133-137.

57. In the *April Smith* matter, the trial court concluded that the February 2006 letter (Ex. 51):

> "contains misleading information, conceals material information, and constitutes an impermissible attempt to influence the putative class members' decision about whether to request exclusion from any class, in the event a class is certified under Rule 52.08(b)(3) herein."

**Ex. 52.**

> **G. The Finance Charge and Annual Percentage Rate were materially understated on the Plaintiffs' loans as a result of the concealment of the insurance charges.**

58. Plaintiff Huffman's Retail Installment Contract and Security Agreement disclosed the following amounts: (1) Annual Percentage Rate: 17.90%, (2) Finance Charge: $10,822.94, and (3) Amount Financed: $18,706.46. **Ex. 31**.

59. Plaintiff Huffman's Retail Installment Contract and Security Agreement disclosed the following Payment Schedule: 66 Payments in the amount of $447.40. **Ex. 31.**

60. The insurance calculation prepared by Centrix for the Huffman loan and sum of the default and VSI insurance premiums totaled $1,714.96. **Ex. 32**, at CUTX002296 ("Centrix

41

Program Information; Insurance Calculation, at "Insurance Premium").

61.     Excluding the premiums for the default and VSI insurance premiums from the Amount Financed calculation for the Huffman loan and including those amounts in the Finance Charge results in the Finance Charge being understated by $1,714.96 and the Annual Percentage Rate being understated by $4.2483%. *See* **Ex 58.**

62.     Plaintiff Sandler's Retail Installment Contract and Security Agreement disclosed the following amounts: (1) Annual Percentage Rate: 17.90%, (2) Finance Charge: $8,272.24, and (3) Amount Financed: $14,012.00. **Ex. 40.**

63.     Plaintiff Huffman's Retail Installment Contract and Security Agreement disclosed the following Payment Schedule: 66 Payments in the amount of $337.64. **Ex. 40.**

64.     The insurance calculation prepared by Centrix for the Sandler loan and sum of the default and VSI insurance premiums totaled $1,316.02. **Ex. 32**, at CUTX001448 ("Centrix Program Information; Insurance Calculation, at "Insurance Premium").

65.     Excluding the premiums for the default and VSI insurance premiums from the Amount Financed calculation for the Huffman loan and including those amounts in the Finance Charge results in the Finance Charge being understated by $1,316.02 and the Annual Percentage Rate being understated by $4.6971%. *See* **Ex 59.**

## III. ARGUMENTS AND LEGAL AUTHORITIES

### A. SUMMARY JUDGMENT STANDARD

The burden on the party seeking summary judgment is a strict one. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Summary judgment is proper only "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Togerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011)(en banc).

The moving party "'bears the initial responsibility of informing the district court of the basis for its motion' and must identify 'those portions of the record which it believes demonstrate the absence of a genuine issue of material fact.'" *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). If the moving party meets its burden, then the party opposing the motion "must respond by submitting evidentiary materials that set out specific facts showing that there is a genuine issue for trial." *Id.*; Rule 56(c). Because summary judgment is a "drastic remedy," a trial court is required to resolve all facts and inferences that may be reasonably drawn from the evidence in favor of the party against whom a summary judgment is sought. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-590 (1986).[3] The Court must liberally construe the pleadings and documentary evidence in favor of the party opposing the motion. *Florom v. Elliott Mfg.*, 867 F.2d 570, 574 (10th Cir. 1989). A motion for summary judgment must be denied whenever reasonable minds could differ as to the conclusions to be drawn from the evidence, or if there is a question as to the credibility of witnesses or the weight of the evidence,

---

[3] *See also Wabun-Inini v. Sessions*, 900 F.2d 1234, 1238 (8th Cir. 1990)("[w]e recognize that summary judgment is a drastic remedy and must be exercised with extreme care to prevent taking genuine issues of fact away from juries"); *Robert Johnson Grain Co. v. Chemical Interchange Co.*, 541 F.2d 207, 209 (8th Cir. 1976)("summary judgment is an extreme remedy, and one which is not to be granted unless the movant has established his right to a judgment with such clarity as to leave no room for controversy and that the other party is not entitled to recover under any discernible circumstances").

or if the facts would otherwise permit a jury to find for the non-moving party. *See, e.g., Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)(the central issue in resolving motions for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law").

**B.     DEFENDANT'S MOTION RAISES DISPUTED QUESTIONS OF FACT PRECLUDING THE ENTRY OF SUMMARY JUDGMENT.**

> **1.     The jury must be allowed to address whether the default insurance premium charges should have been disclosed on the Plaintiffs' Retail Installment Contracts and Security Agreements.**

The Court should deny Defendant's motion because there are disputed questions of fact concerning the merits of Plaintiffs' MMPA claims that must be resolved before Defendant's statute of limitations defense can be analyzed. Because of these disputed questions, Defendant has not established its right to summary judgment and its motion should be denied.

As noted above, the jury must first determine whether Defendant's subprime motor vehicle financing program utilized any "unlawful practices" prohibited by the MMPA in connection with the admitted non-disclosure and concealment of the default insurance and VSI insurance premiums that were "directly" or "indirectly" charged to the Plaintiffs through the terms of their financing and that Defendant obtained in connection with the PMP loans. *See* §407.020.1 RSMo; 15 C.S.R. §§60-8.020.1; 60-8.060(1); 60-8.090.1; 60-9.010(1)(C); and 60-9.110(3)). This includes the core questions of whether the insurance premium charges should have been disclosed on the Plaintiffs' Retail Installment Contracts and Security Agreements ("RISC's") because they were "direct" or "indirect" charges for the "cost of credit" such that the charges for the insurance premiums were "finance charges" as defined by and subject to the disclosure obligations of the Truth in Lending Act, 15 U.S.C. §§1601, *et seq.*, ("TILA") and because they are charges for insurance products obtained in connection with the installment

sales/loans which are subject to specific disclosure and consent requirement of Missouri law. These questions concerning the applicability of disclosure requirements of federal and Missouri law to the default insurance premiums at issue in this matter are particularly appropriate for resolution by the jury. Indeed, a similar question concerning the interpretation of Missouri's Second Mortgage Loans Act, at §408.233.1 RSMo, was put to the jury in the *Mitchell v. Residential Funding Corporation* class action involving the undersigned counsel. In upholding the jury's verdict, the Court stated:

> "'indirectly' charging or receiving a fee most naturally means using a conduit or intermediary to charge or receive a fee on one's behalf."… 'The law will not tolerate any camouflage disguising a ... transaction to make it seem innocent.'" ... "The law looks at the nature and substance of the transaction, and not to the color or form which the parties in their ingenuity have given it."…
>
> ***
>
> Further, although Assignee Defendants argue they could not have "indirectly" acted through their role in MCR's loan originations, the jury was not required to believe them. Finally, the fees were rolled into the loan principal on which Defendants charged interest; this also supports a finding that Assignee Defendants "indirectly charged, contracted for or received" an unauthorized charge "in connection with" these second mortgage loans….

*Mitchell v. Residential Funding Corp.*, 334 S.W.3d 477, 502 (Mo.App.W.D. 2010).

As is explained more fully below, this core "disclosure" issue directly relates to Defendant's statute of limitations defense and the propriety of summary judgment because the concealment or failure to disclose "material information" that one is under a legal duty to truthfully disclose can (and should in this instance) delay the accrual of the statute of limitations at §516.120(5) RSMo until actual discovery of the facts constituting the fraud underlying their MMPA claims by Plaintiffs, which includes discovery of the specific facts of Defendant's scienter and mental state. Further, because the relationship between the parties in this instance requires a specific, disclosure of this insurance, Missouri law permits the tolling of the statute of

3

limitations and excuses the Plaintiffs' lack of diligence in trying to discover the facts of the fraud and Defendant's scienter. Here, it is undisputed that, regardless of the dates of Defendant's misconduct directed towards Plaintiffs relative to the five-year period preceding the filing of this lawsuit, Plaintiffs did not discover the specific facts constituting the fraud underlying their MMPA claims and Defendant's culpable mental state until November 2010, which was shortly before this lawsuit was filed (on November 24, 2010). Thus, Plaintiffs' MMPA claims are timely under the provisions of §516.120(5) pursuant to its "discovery rule" and principles of equitable tolling/estoppel based upon the issue for the jury that Defendant engaged in "unlawful practices" prohibited by §407.020.1 in connection with its transactions with Plaintiffs.

> **2.** **§516.120(5) RSMo and Its "Discovery Rule" Of "The Facts Constituting The Fraud" Applies To The Fraud Underlying Plaintiffs' MMPA Claims.**

Plaintiffs submit that the statute of limitations governing their MMPA claims is §516.120(5) RSMo. Both the Eighth Circuit and this Court have generally stated that the Plaintiffs' MMPA claims are governed by the five-year statute of limitations set forth in §516.120 RSMo. Neither this Court nor the Eighth Circuit, however, have specifically stated whether Plaintiffs' MMPA claims fall within subsection (2), which generally applies to "An action upon a liability created by a statute other than a penalty or forfeiture" or subsection (5), which specifically applies to "An action for relief on the ground of fraud" and states that "the cause of action in such case to be deemed not to have accrued until the discovery by the aggrieved party, at any time within ten years, of the facts constituting the fraud." *Compare Rashaw v. United Consumers Credit Union*, 685 F.3d 739, 745 (8th Cir. 2012); *Huffman v. Credit Union of Texas*, 2011 WL 5008309, *5 (W.D.Mo. 2011). And, although there are some cases which state, without much analysis, that the general statute of limitations set forth in subsection

4

(2) applies to MMPA claims, there do not appear to be any decisions that directly address whether subsection (5) for "actions for relief on the ground of fraud" should or must apply to MMPA claims that clearly seek "relief on the ground of fraud" and require proof of the same or similar elements for purposes of the MMPA or punitive damages. *See* §407.020.1 RSMo; *Clement v. St. Charles Nissan, Inc.*, 103 S.W.3d 898, 899 (Mo.App.E.D. 2003)("the MMPA was created to "supplement the definition of common-law fraud").

Clearly, subsection (5) and its "discovery" rule must apply to Plaintiffs' MMPA claims that are based on Defendant's omissions of material fact and seek punitive damages. First, the MMPA defines an "omission of a material fact" as "any failure to disclose material facts that are known to him/her, or upon reasonable inquiry would be known to him/her." 15 C.S.R. §60–9.110(3). This language includes a "scienter" element. *Hope v. Nissan N. Am., Inc.*, 353 S.W.3d 68, 84 (Mo.App. 2011). So too does the "discovery rule" in §516.150(5) because the statutory language "discovery of the facts constituting the fraud" also includes a "scienter" element. *Merck & Co., Inc.*, 130 S. Ct. at 1798. Second, because the MMPA is a consumer protection statute that is broadly construed, the applicable statute of limitations for MMPA claims should and must also be broadly construed in order to provide those protections to consumers.[4]

The application of §516.120(5) to Plaintiffs' MMPA claims must also include the application of the "discovery rule" to extend the accrual of the cause of action and, also, principles of equitable tolling and estoppel to toll the statute of limitations. Both rules/principles are appropriate under the law and the facts of this case.[5] Indeed, it would entirely "frustrate the

---

[4] *See Gibbons v. J. Nuckolls, Inc.*, 216 S.W.3d 667, 669 (Mo. banc 2007); *Huch v. Charter Communications, Inc.*, 290 S.W.3d 721, 724 (Mo. banc 2009); *Owen*, 533 F.3d.at 922 (citing §407.020.1: deceptive practice violates MMPA regardless of whether act was 'committed before, during or after the sale, advertisement or solicitation'").

[5] *See Ramadan v. Chase Manhattan Corp.*, 156 F.3d 499, 502 (3rd Cir. 1998)(citing *Bailey v. Glover*, 88 U.S. (21 Wall.) 342, 349, 22 L.Ed. 636 (1874))("As the Supreme Court recognized years ago, '[t]o hold that by concealing a

very purpose of the discovery rule" set forth in §516.120(5) to construe the limitations period to have expired regardless of whether Plaintiffs had actually discovered any facts evidencing Defendant's fraud and scienter. This interpretation of the statute is improper because "the statute contains no indication that the limitations period should occur at some earlier moment before the actual "'discovery of the facts" and means that the Defendant can conceal its omissions of material fact throughout the limitations period and escape liability before Plaintiffs had actually "discover[ed]" the fraud. *Merck & Co., Inc.*, 130 S.Ct. at 1796-97.

### C. BECAUSE OF THE DISCLOSURE REQUIREMENTS OF FEDERAL AND MISSOURI LAW, DEFENDANT'S STATUTE OF LIMITATIONS DEFENSE INVOLVES DISPUTED QUESTIONS OF FACT.

As noted above, the failure to disclose or concealment of "material" information that one is under a duty to disclose (as here) can (and should in this instance) serve as a basis to toll the statute of limitations and also delay the accrual of the Plaintiffs' cause of action until their actual discovery of the facts constituting the fraud and Defendant's culpable mental state. That is so, regardless of the Plaintiffs' diligence to discover the fraud. Both federal and Missouri law require the disclosure of the default insurance premiums on the Plaintiffs' RISC's. As such, the concealment and non-disclosure of this specific information can and does constitute unlawful and fraudulent practices under §407.020 and related regulations, and also serves as a basis to toll the statute of limitations. *See, e.g., Merck & Co., Inc.,* 130 S.Ct. at 1796 ("We consequently hold that facts showing scienter are among those that 'constitut[e] the violation'").

### 1. The charges for the default insurance premiums should have been disclosed to the Plaintiffs pursuant to Federal law.

---

fraud, or by committing a fraud in a manner that it concealed itself until such time as the party committing the fraud could plead the statute of limitations to protect it, is to make the law which was designed to prevent fraud the means by which it is made successful and secure." Disallowing equitable tolling in § 1640(e) would allow lenders to avoid liability through intentionally fraudulent actions using a statute designed to prohibit that same conduct.'").

TILA is a consumer protection statute that applies to all consumer credit transactions, subject to limited exceptions which do not apply in this matter. 15 U.S.C. §1603. It applies to the Plaintiffs' transactions, which is, of course, why their RISC's contain formatted spaces for the legally-mandated disclosures required by TILA, as well as specific sections for the disclosure of finance charges and insurance products obtained in connection with the loan.

The underlying purpose of TILA is to promote the "informed use of credit" and to avoid "misleading consumers as to the total costs of financing" by requiring all creditors to tell consumers in terms and with forms universal to all types of consumer lending what the "true cost of the credit" is to the borrower.[6] Thus, at its most fundamental level, TILA requires lenders to provide accurate and timely disclosures to prospective borrowers of the "true cost" of a loan. "The Truth in Lending Act was necessary exactly because borrowers could not force creditors to provide voluntarily a system of credit within which consumers could function intelligently." *Parker v. De Kalb Chrysler Plymouth*, 673 F.2d 1178, 1181 (5th Cir. 1982).

This "cost" is described under the commonly recognized statutory terms "Amount Financed", "Finance Charge" and the "Annual Percentage Rate ("APR")" which are, of course, disclosed in specific boxes on the RISC. Indeed, TILA statutorily defines these as "***material disclosures.***" *See* 15 U.S.C. §1602(u).[7] Thus, these required disclosures must also be treated as

---

[6] *See, e.g.,* 15 U.S.C. § 1601(a)("It is the purpose of this subchapter to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices."); *Thomka v. A.Z. Chevrolet, Inc.*, 619 F.2d 246, 248 (3rd Cir. 1980) ("The Truth-in-Lending Act was passed primarily to aid the unsophisticated consumer so that he would not be easily misled as to the total costs of financing"); 12 C.F.R. § 226.1(b).

[7] These terms reflect Congress' desire to avoid "informational overload" by focusing on the terms "most relevant to a consumer's initial credit decision." *Household Credit Services, Inc. v. Pfennig*, 541 U.S. 232, 243 (2004); 12 C.F.R. § 226.17(a)(1); *see also Mourning v. Family Publications Service*, 411 U.S. 356, 377 (1972)("the Truth in Lending Act reflects a transition in Congressional policy from a philosophy of 'let the buyer beware' to one of 'let the seller disclose."); *Williams v. Chartwell Financial Services, Ltd.*, 204 F.3d 748, 751 (7th Cir. 2000)("Congress enacted TILA to ensure that consumers receive accurate information from creditors in a precise and uniform manner that allows them to compare the cost of credit.").

"material" disclosures for purposes of the MMPA because federal law deems it important for protection of the public. *See* 15 C.S.R. 60–9.010(1)(C)("a material fact for MMPA liability includes "any fact which a reasonable consumer would likely consider to be important in making a purchasing decision."); 15 C.S.R. §§60-8.020, 60-8.090(1)(an unfair practice "violates state or federal law intended to protect the public.").

The term "Finance Charge" is defined at 15 U.S.C. §1605 and 12 C.F.R. §226.4. It represents "the cost of consumer credit as a dollar amount." 12 C.F.R. § 226.4(a). TILA defines the Finance Charge "as the sum of all charges, payable ***directly or indirectly*** by the person to whom the credit is extended, ***and imposed directly or indirectly by the creditor*** as an incident to the extension of credit." 15 U.S.C. §1605(a)(emphasis added); 12 C.F.R. §226.4(a) [8] By its plain language, TILA presumes that all ***direct***, as well as ***indirect,*** settlement charges are included in the Finance Charge. And, with respect to the default insurance charges, TILA specifically states:

> Charges or premiums for insurance, written in connection with any consumer credit transaction, against loss of or damage to property or against liability arising out of the ownership or use of property, shall be included in the finance charge unless a clear and specific statement in writing is furnished by the creditor to the person to whom the credit is extended, setting forth the cost of the insurance if obtained from or

---

[8] Directly related and mutually exclusive to the Finance Charge is the "Amount Financed" on a loan. The "amount financed" is "the amount of credit of which the consumer has actual use." 15 U.S.C. §1638(a)(2)(A). The Amount Financed is calculated by adding the charges that are not finance charges but that are financed by the creditor and then subtracting the "prepaid finance charges," which are the charges that are included in the finance charge and the borrower pays for them by withholding them from the proceeds of their loan. 15 U.S.C. §1638(a)(2)(A); 12 C.F.R. §226.18(b). This term tells the borrower "those legitimate components of the obligation which are advanced by the lender or paid to others on the borrower's behalf." Because a borrower does not have "actual use" of required third party charges, such charges cannot be part of the "amount financed" under TILA. *Gibson v. LTD, Inc.*, 434 F.3d 275, 283-85 (4th Cir. 2006)("If a lender has no basis for including a charge …. as part of the purchaser's amount financed, the disclosure of the 'amount financed' is erroneous, and the error gives rise to TILA liability."); 15 U.S.C. §§1605(a), 1638(a)(2)(A); 12 C.F.R. §§226.4(a)(2), 226.18(b). Additionally, the APR is "the measure of the cost of credit, expressed as a yearly rate, that relates the amount and timing of value received by the consumer to the amount and timing of payments made." 12 C.F.R. §226.22(e); see also § 226.18(e)("the costs of your credit at a yearly rate"). Because the APR is affected by the calculations of the Finance Charge and Amount Financed, it can only be calculated after those calculations are made. 15 U.S.C. §1606(a); 12 C.F.R. § 226.22(a); Appendix J to 12 C.F.R. Part 226. The finance charge and APR are interrelated in that an inaccurate finance charge necessarily makes the APR disclosure inaccurate. *Id.*

through the creditor, and stating that the person to whom the credit is extended may choose the person through which the insurance is to be obtained.

15 U.S.C §1605(c). Thus, as courts have held, the default insurance and VSI insurance premiums at issue here "or other charge[s] for any guarantee or insurance protecting the creditor against the obligor's default or other credit loss" are part of the "Finance Charge" and the "cost of credit" and the "material disclosures" that the creditor must disclose to the borrower as Finance Charges in the specific boxes designed for "Credit Insurance" and "Single Interest Insurance" on the RISC. 15 U.S.C. §1638(a)(5); 12 C.F.R. §226.4(b)(5); *Adams v. Plaza Fin. Co., Inc.*, 168 F.3d 932, 934 (7th Cir. 1999)("A premium for default insurance is such a charge, and so it belongs in the "finance charge" (interest) column of the disclosure form."); *Hicks v. Star Imports, Inc.*, 5 Fed.Appx. 222, 224, 226-27 (4th Cir. 2001)("Some comprehensive insurance policies may include a variety of additional coverages, such as repossession insurance and holder-in-due course insurance. These types of coverage do not constitute single-interest insurance for purposes of the regulation, and premiums for them do not qualify for exclusion from the finance charge under § 226.4(d).").[9] Because these charges were not disclosed to Plaintiffs, the Finance Charge was understated by the amount of the insurance premiums and the APR was understated by 4.24% for Plaintiff Huffman and 4.69% for Plaintiff Sandler. (PUF-58-65).

>    **2.     The charges for the default insurance premiums should have been disclosed to the Plaintiffs pursuant to Missouri law.**

Missouri's Motor Vehicle Time Sales Act ("MVTSA"), §§365.010–365.160 RSMo, regulates installment sales of motor vehicles. The MVTSA sets forth restrictions on "insurance included in retail installment transactions" and states, in pertinent part:

---

[9] *See also, e.g., In re Consol. ""Non-Filing Ins.".'' Fee*, 2001 WL 35840127, *3 (M.D.Ala. 2001)("Rather, the creditor would prefer to characterize a fee as a NFI charge, thereby allowing the creditor to include the fee in the "amount financed" calculation and avoid increasing in the finance charge above what the debtor may be willing to pay or what usury laws permit….").

…A buyer may be required to provide insurance on the motor vehicle at his own cost for the protection of the seller or holder, as well as the buyer, but the insurance shall be limited to insurance against substantial risk of loss, damage or destruction of the motor vehicle. Any other insurance, including insurance providing involuntary unemployment coverage, may be included in a retail installment transaction at the buyer's expense ***only if contracted for voluntarily by the buyer***….

Nothing in this chapter shall be construed to prohibit the sale of a deficiency waiver addendum, guaranteed asset protection, extended service contract, or other similar products purchased at the time of sale, as part of a retail sale transaction involving any motor vehicle, or including the cost therefor within a retail installment transaction, provided the requirements of section 365.070 are met.

§365.080.1,.4 RSMo (emphasis added); §365.070.6(7)("The amounts, if any, if a separate identified charge is made therefor, included for other insurance and benefits, specifying the types of coverage and benefits and the coverage periods and separately stating each amount for each insurance premium or benefit"). Violations of this provision of the MVTSA are significant: "Any person violating section 365.070, 365.080, 365.090, 365.100, 365.110, 365.120, 365.130, 365.140, or 365.145 shall be barred from recovery of any time price differential, delinquency or collection charge on the contract."§365.150.2 RSMo; *Fielder v. Credit Acceptance Corp.*, 19 F.Supp.2d 966, 982 (W.D. Mo. 1998), *vacated in part on other grounds,* 188 F.3d 1031 (8th Cir. 1999). Similarly, the Consumer Loan Act states in pertinent part:

No further or other charge or amount whatsoever ***shall be directly or indirectly charged, contracted for or received for interest, service charges or other fees as an incident to any such extension of credit*** except as provided and regulated by sections 367.100 to 367.200 and except:…

(11) A deficiency waiver addendum, guaranteed asset protection, or a similar product purchased as part of a loan transaction with collateral ***and at the borrower's consent***, provided the cost of the product is disclosed in the loan contract, is reasonable, and the requirements of section 408.380 are met.

§408.140.1(11) RSMo (emphasis added). Further, the Retail Credit Sales Act states:

No provision of this section shall be construed to prohibit the sale of a deficiency waiver addendum, guaranteed asset protection, or a similar product purchased as part of a loan transaction with collateral and at the borrower's consent, ***provided the cost***

> *of the product is disclosed in the loan contract, is reasonable, and the requirements of section 408.380 are met.*

§408.300(4) RSMo (emphasis added). Similarly, the Retail Credit Sales Law states:

> Notwithstanding any provision of sections 408.140, 408.233, 408.300, or any other law to the contrary, no provision of such sections shall be construed to prohibit the sale of a deficiency waiver addendum, guaranteed asset protection, or a similar product purchased as part of a loan transaction with collateral and at the borrower's consent, ***provided the cost of the product is reasonable and is disclosed in the loan contract. The borrower's consent to the purchase of the deficiency waiver addendum, guaranteed asset protection, or a similar product shall be in writing and acknowledge receipt of the required disclosures by the borrower. The creditor shall retain a copy for the file.***

§408.380.1 RSMo (emphasis added).

For violations of these statutes in Chapter 408, borrowers can sue for actual and punitive damages, as well as their attorneys' fees and for other relief. *See* §408.562 RSMo.

Altogether, these provisions state a general rule and policy that, regardless of how the transaction is characterized for purposes of Chapter 408, the seller/creditor is required to disclose charges for insurance products obtained in connection with a motor vehicle sale or loan. That requirement is in place so that the borrower is aware of the charge, and can consent to its purchase and/or choose to provide it on their own. A jury could reasonably conclude that the Defendant's lending program violated these disclosure obligations of Missouri law and that its efforts to conceal these charges constituted unfair practices in violation of the MMPA.

> **3. Because of these disclosure obligations under federal and Missouri law, the statute of limitations for Plaintiffs' MMPA claims is tolled and/or does not accrue until actual discovery of the facts constituting the fraud underlying their MMPA claims.**

Defendant's efforts to conceal the charges for the default insurance and other hidden fees and finance charges in the RISC when both federal and Missouri law required its disclosure, and its subsequent efforts to collect payments on the Plaintiffs' loans and to conceal this information

11

in its communications with the Plaintiffs not only constitutes unfair practices and misconduct which are unlawful under the MMPA, but they are also part and parcel of the same unlawful practices and misconduct that tolls the statute of limitations and delays the accrual of Plaintiffs' cause of action. Because the questions concerning the merits of Plaintiffs' MMPA claims must be resolved by the jury before the merits of the Defendant's motion can be resolved, the Court should deny Defendant's motion

Specifically, Plaintiffs have evidenced a number of facts which demonstrate that they did not discover the facts of Defendant's fraud and their cause of action until November 2010, shortly before their lawsuit was filed, and that therefore the statute of limitations for their claims should, as the law provides, be tolled. *See Rogers v*, 2010 WL 1486353, *2; *see* PUF-23-25, 30-35, 40-42, 46-49, 52-53, 54, 56-57; R-DUF-6, 9, 18, 21, 23-24, 27, 32, 36-37, 43, 46-51.[10]

> With respect to the appropriateness of equitable tolling, this Court has noted,
>
> if the plaintiff's suit is commenced more than 5 years after the fraudulent representations are made, the plaintiff must plead facts "'toll[ing]' "the limitations period, which *could* include facts showing plaintiff's due diligence in attempting to discover the fraud *or facts showing that plaintiff was powerless to discover the fraud sooner.... In general, the issue of when the plaintiff discovered or by reasonable diligence could have discovered fraud is a question of fact.*

*Rogers*, 2010 WL 1486353, *2. And, with respect to the application of "discovery rules" in statutes of limitation, the United States Supreme Court has held that statutory language requiring "discovery of facts constituting the fraud" means that the statute of limitations does not begin to run until the plaintiff discovers the specific facts of the defendant's scienter and mental state. *See Merck & Co., Inc.*, 130 S.Ct. at 1790, 1798. As explained by the Supreme Court:

---

[10] "PUF-__" refers to Plaintiffs' Additional Undisputed Facts Precluding the Entry of Summary Judgment in Favor of defendant. "R-DUF-__" refers to Plaintiffs' Response to Defendant's Statement of Allegedly Uncontroverted Material Facts."

This Court long ago recognized that something different was needed in the case of fraud, where a defendant's deceptive conduct may prevent a plaintiff from even *knowing* that he or she has been defrauded. Otherwise, "the law which was designed to prevent fraud" could become "the means by which it is made successful and secure." *Bailey v. Glover,* 21 Wall. 342, 349, 22 L.Ed. 636 (1875). Accordingly, "where a plaintiff has been injured by fraud and remains in ignorance of it without any fault or want of diligence or care on his part, the bar of the statute does not begin to run until the fraud is *discovered*."

*Id. at* 1793-94 (emphasis in original). In turn, the doctrine of equitable estoppel stops" 'a defendant...from setting up the statute where, his conduct, though not fraudulent, has nevertheless induced the plaintiff to delay in bringing suit until after the expiration of the statutory period.' *McCrary v. Truman Med. Center, Inc.,* 916 S.W.2d 831, 833 (Mo.App.W.D. 1995)(quoting *Sugent v. Arnold's Estate,* 340 Mo. 603, 101 S.W.2d 715, 718 (1937)).

Here, Plaintiffs were in fact "powerless to discover the fraud sooner" and the facts of the fraud and Defendant's culpable wrongdoing because their RISC's did not disclose the specific information concerning the default insurance despite the requirements of federal and Missouri law that required its disclosure. It is the ***legal obligation to specifically disclose the default insurance that is the key*** to the application of tolling principles in this case and also the basis under Missouri law that the statute of limitations does not begin to run until actual discovery of the fraud and Defendant's scienter by Plaintiffs. As the Eighth Circuit has explained,

As a general rule a party seeking to avoid the bar of the statute of limitations on account of fraud must aver and show that he used due diligence to detect it, and if he had the means of discovery in his power, he will be held to have known it. A party cannot avail himself of this exception to the statute when the means of discovering the truth were within his power and were not used. Concealment by mere silence is not enough. There must be some trick or contrivance intended to exclude suspicion and prevent inquiry. There must be reasonable diligence; and the means of knowledge are the same thing in effect as knowledge itself. ***This rule, however, is subject to qualification where a relation of trust and confidence exists between the parties. When a plaintiff is lulled into a sense of security by reason of such relationship rendering it the duty of the defendant to disclose the truth he is under no duty to make inquiry, and the statute does not begin to run until actual discovery of the fraud. If there was nothing in the transaction at the time, and nothing occurred***

> *later, to cause a reasonably prudent person to suspect fraud, he is not guilty of negligence in failing to ferret it out.*

*Aetna Cas. & Sur. Co.*, 830 F.2d at 954; *Brown v. Irving-Pitt Mfg. Co.*, 316 Mo. 1023, 1028, 292 S.W. 1023, 1026 (1927); *Thompson v. Lyons*, 281 Mo. 430, 220 S.W. 942, 946-47 (1920); *see also Owen v. General Motors Corp.*, 533 F.3d 913, 920-21 (8th Cir. 2008)(fraudulent concealment of cause of action by one with a duty to speak or superior knowledge not within the reach of other party can serve as basis for equitable tolling).

Put another way, because the jury could conclude that Defendant and each motor vehicle dealer (and their common assignee, the Defendant) were under a legal duty to disclose specific information regarding the finance and insurance charges on the standard form RISC pursuant to separate laws (and not merely the MMPA), the statute of limitations for the Plaintiffs' MMPA claims does not accrue and/or is tolled until actual discovery of the facts of the fraud underlying their MMPA claims, regardless of the Plaintiffs' diligence. This includes the facts of Defendant's "scienter." *See Aetna Cas.*, 830 F.2d at 954-55; *Merck & Co., Inc.*, 130 S.Ct. at 1798.[11]

Further, Plaintiffs have alleged and evidenced, a number of facts which demonstrate that they did not in fact discover Defendant's fraud and their cause of action until November 2010, shortly before their lawsuit was filed, and that the statute of limitations for their claims should, as the law provides, be tolled. *See Rogers*, 2010 WL 1486353, *2; *see* **Ex. 1**, at ¶¶38-42, 80. With respect to the tolling of the statute of limitations, Plaintiffs specifically alleged:

---

[11] *See also Rademeyer v. Farris*, 284 F.3d 833, 837 (8th Cir. 2002)("the required discovery depends upon and is determined by the relationship of the plaintiff and defendant prior to the commission of the fraud. ... The law deems it reasonable for someone to place trust in a fiduciary, and so a person is not expected to be as vigilant with respect to fiduciaries as he or she might otherwise be")(internal citation omitted); *Schuchmann v. Air Services Heating & Air Conditioning, Inc.*, 199 S.W.3d 228, 233 (Mo.App. 2006)("There is sufficient evidence here to support a finding that Defendant preyed on unsophisticated consumers, inducing them to buy its products on the promise that the units would work for a 'lifetime' or the problem would be fixed. When this promise turns out to be untrue, who should bear the burden?").

38.     Using its defective and unlawful pre-sale notices and communications to the Class members, as well as the act of sending the deceptive communication with the $100.00 check referenced above, Credit Union of Texas actively misled the Class members concerning their rights under Missouri law and it misrepresented the legality of its post-repossession activities and took affirmative action to prevent the Class members from enforcing their legal rights.

39.     Credit Union of Texas also fraudulently concealed from the Class members the hidden fees and finance charges imposed in connection with the Class members' motor vehicle financing, as well as its acquisition of default insurance in connection with their loans, which hidden fees were incorporated into its credit and underwriting guidelines for its motor vehicle loans as part of the Portfolio Management Program.

40.     Further, following the disposition and sale of the Class members' motor vehicles, Credit Union of Texas sent to the Class members a communication identifying the alleged deficiency balances on their loans. Further, Credit Union of Texas caused the Class members' credit reports to reflect a repossession and/or outstanding deficiency balance.

41. Defendant's common, classwide course of post-repossession conduct and actions was designed to conceal the fact that it has been reimbursed for the deficiency losses by the providers of default insurance, as well as through an Indemnification Agreement it entered into with Centrix. Because it had been reimbursed for deficiency losses, Credit Union of Texas had no interest or intent in pursuing its alleged deficiency claims against the Class members. As such, its communications with the Class members and its credit reporting, was false and/or misleading, and designed to prevent the Class members from enforcing their legal rights to contest an alleged deficiency claim.

42.     Accordingly, Credit Union of Texas should be estopped from relying upon any delay by the Class members in enforcing their rights under Missouri law, if any, and all applicable statutes of limitations on the Class members' claims should be equitably tolled.

                                                      ***

80.     Further, built into the costs of each of the loans, but not disclosed or explained to the Class members, were the premiums for policies of default protection insurance and other insurance which named Credit Union of Texas as the insured and/or which covered or provided benefits to Credit Union of Texas for losses caused by borrower defaults, repossessions and depreciation of the motor vehicles.

**Ex. 1**, at ¶¶ 38-42, 80. With respect to their discovery of Defendant's frauds, Plaintiffs alleged:

8.     Notably, in conjunction with each loan made or obtained in connection with the Portfolio Management Program, and ***unknown to the Class members until shortly before filing this lawsuit,*** Credit Union of Texas obtained and/or purchased, and/or was named as the insured on polices of default protection insurance and other

insurance in conjunction with Portfolio Management Program and on Plaintiffs' and the Class members' loans, or was covered under such policies.

**Ex. 1**, at ¶8 (emphasis added).

These allegations are entirely consistent with the evidence in the record, including Plaintiffs' testimony concerning the communications received from Plaintiffs' counsel and their "discovery" of the facts underlying their MMPA claims. *See* PUF-23-25, 30-35, 40-42, 46-49, 52-53, 54, 56-57; R-DUF-6, 9, 18, 21, 23-24, 27, 32, 36-37, 43, 46-51; **Ex. 53-A.**

In its Motion, Defendant argues that the Plaintiffs "could have discovered the alleged MMPA violations because "other plaintiffs represented by the same counsel were able to allege MMPA injuries based on the same conduct from the same time period within the statute of limitations." Doc. 91, at p.13. This argument is flawed and the factual premise of the argument leads to the opposite conclusion. The knowledge of Plaintiffs' counsel gained from their work in other matters is not somehow disseminated to the general public at large with whom counsel has no relationship and prior to the formation of the attorney-client relationship.

**D. SUMMARY JUDGMENT IS IMPROPER BECAUSE DEFENDANT'S MISCONDUCT AFTER THE INITIAL SALES TRANSACTIONS SERVES AS ADDITIONAL REASONS TO TOLL OR EXTEND THE STATUTE OF LIMITATIONS.**

Defendant's misconduct occurring after the date of the initial sales transactions provides additional reasons to toll the statute of limitations for the Plaintiffs' MMPA claims, even though that same misconduct gives rise to liability for violations of the MMPA. *See* **Ex. 1**, at ¶¶38-42, 86. Therefore, the Court should deny Defendant's motion because this later misconduct raises unresolved questions for the jury to consider before the tolling questions can also be addressed.

For example, because the pre-sale and post-sale communications sent to the Class members contained misstatements of the amounts set forth thereon as to the amounts the

16

Plaintiffs owed to the Defendant to cure their default and also owed as a deficiency, Missouri law treats those communications as misleading.[12] Even more, because of the default insurance, Defendant had been compensated for all or part of its losses caused by the deficiencies on the loans. Even so the letter did not reveal Defendant's recovery of insurance proceeds. PUF-35, 51. A jury could reasonably conclude that these communications were misleading and, as Plaintiffs alleged, designed to conceal the default insurance that Plaintiffs unknowingly paid for and financed. Such findings serve as a basis to toll the statute of limitations.

Along these same lines, the jury must be able to consider whether, as Plaintiffs also alleged, the $100 checks that Centrix issued to the Plaintiffs provides additional reasons not only for Defendant's liability for violations of the MMPA, but additional reasons to extend or toll the statute of limitations for the Plaintiffs' claims. (PUF-54, 56-57) Because these questions are disputed, summary judgment is improper and the Court should deny Defendant's motion.

That is, the undisputed facts demonstrate that Centrix and Midwest United Credit Union were sued in February 2005 in the Circuit Court of Jackson County, Missouri in *April Smith v. Centrix Financial, LLC, et al*., Case No. 0516-CV-05165 (Cir. Ct. Jackson County, Missouri) for violations of the Commercial Code related to the pre-sale communications sent to Midwest United Credit Union's PMP borrowers. (PUF-54) In February 2006, Centrix sent to Plaintiffs a letter with a $100.00 checks, in an obvious attempt (based upon the language of the letter and on the back of the check) to obtain some type of accord and satisfaction settlement with them in case they were sued in another action. (PUF-56-57) That letter is misleading for a number of

---

[12] *See Mancuso v. Long Beach Acceptance Corp*., 254 S.W.3d 88, 91-92 (Mo.App.W.D. 2008)(notice is "'not reasonable" if it "misstates the amount owed or requires things of the debtor that are not actually owed"); *Fielder*, 19 F.Supp.2d at 986 ("the notice of resale may not contain such misleading information even if the other basic information required by the statute is included"); §400.9-616(d)("explanation of calculation of surplus or deficiency"); PUF-30-34; 46-49.

reasons as alleged in the Complaint, **Ex. 1**, at ¶¶19-22, so the fact that Defendant's authorized agent sent the letter to Plaintiffs is relevant to Plaintiffs' MMPA claims and the discovery/ tolling issues. It necessarily creates issues for the jury to resolve. Indeed, in the *April Smith* matter, the trial court concluded that the letter

> "***contains misleading information, conceals material information, and constitutes an impermissible attempt to influence the putative class members' decision about whether to request exclusion from any class, in the event a class is certified under Rule 52.08(b)(3) herein.***"

**PUF-57; Ex. 52.** These are the same findings a jury could make with respect to Plaintiffs' MMPA claims. Notably, Defendant makes much of the fact that Plaintiffs testified to their use of the $100 sent with the letter for moving expenses and a "steak dinner." *See* Doc. 91, p.9-10. But the testimony only evidences, and a jury could certainly reach this conclusion, that the letter was misleading and concealed information from Plaintiffs because Plaintiffs simply did not appreciate the purpose for which Centrix sent the letter and check in the first place. The jury's findings as to the February 2006 letter will relate directly to the fact questions raised by the limitations and tolling issues. *See Rogers*, 2010 WL 1486353, at *2. As such, summary judgment is not appropriate on Plaintiffs' MMPA claims.

## IV.    CONCLUSION

For all of these reasons, the Court should deny Defendant's motion for Summary Judgment. The jury can reasonably conclude that Defendant engaged in "unlawful practices" within the provisions of §407.020.1 in its transactions with the Plaintiffs and such unlawful practices can and should toll the statute of limitations for their claims. Because the Plaintiffs did not discover the facts of Defendant's fraud and misconduct underlying their MMPA claims and its culpable mental state until November 2010, their MMPA claims were timely filed.

Dated: January 21, 2013

Respectfully submitted,
WALTERS BENDER STROHBEHN &
 VAUGHAN, P.C.

By: */s/ Garrett M. Hodes*
R. Frederick Walters – Mo. Bar 25069
J. Michael Vaughan – Mo. Bar 24989
Kip D. Richards - Mo. Bar 39743
Garrett M. Hodes – Mo. Bar 50221
    2500 City Center Square
    1100 Main Street
    Kansas City, Missouri 64105
    (816) 421-6620
    (816) 421-4747 (Facsimile)

ATTORNEYS FOR PLAINTIFFS AND
PROPOSED CLASS COUNSEL


## CERTIFICATE OF SERVICE

I hereby certify that I filed this document electronically with the United States District Court for the Western District of Missouri with notice of case activity to be generated and sent electronically by the Clerk of the Court to all designated persons this **21st day of January 2013**:

*/s/ Garrett M. Hodes*
Attorneys for Plaintiff

## EXHIBITS

| | |
|---|---|
| 1 | Class Action Petition for Damages in *Elaine Huffman and Charlene S. Sandler v. Credit Union of Texas* case no Filed on November 24, 2010 |
| 2 | Order Granting Class Certification in Part and Denying in Part in *Landrum v. Meadows Credit Union*, Case No 08-441-CV-W-DW, dated August 4, 2010 |
| 3 | Order Granting Class Certification in Part and Denying in Part in *Hopkins v Kansas Teachers Credit Union v. Marathon Rothschild Credit Union et al.*, Case No 08-05052-CV-SW-GAF, dated February 18, 2010 |
| 4 | Order – Amended Order Granting Plaintiff's Motion for Class Certification in *April Smith v. Centrix Financial, LLC, et al*, Case No. 0516-CV-05165, dated June 13, 2006 |
| 5 | Order Denying Defendant Community America Credit Union's Motion to Decertify the Class in *April Smith v. Centrix Financial, LLC, et al,* Case No 0516-CV-05165, dated January 21, 2009 |
| 6 | Responses of Defendant Credit Union of Texas to Plaintiffs' First Request for Production of Documents *Elaine T. Huffman v. Credit Union of Texas* Case No 4:11-cv-00022-ODS dated May 6, 2011 |
| 7 | Centrix Sub-Prime Auto Loan Program (CUTX006293-6299) - **Confidential** |
| 8 | Centrix Sub-Prime Auto Loan Program Presentation, dated December 19, 2001 (CUTX016607-16) **Confidential** |
| 9 | Centrix Financial Standard Loan Placement Agreement, dated November 19, 2001 (CUTX005923-32) |
| 10 | Centrix Financial Confirmation of the Credit Union Sub-Standard Underwriting Guidelines Amendment, dated December 20, 2001 (CUTX005922) |
| 11 | Credit Union Procedure For Centrix PMP – Credit Union Approval of Sub-Prime Credit Guidelines, dated July 25, 2001 (CUTX005580-81) **Confidential** |
| 12 | Centrix Financial Correspondence between John Schreven and K.Sorrels re. Lyndon Insurance Agreement, dated April 24, 2002 (CUTX006050-59) |
| 13 | Centrix Financial PMP Procedure: Loan Application/Contract/Funding, dated July 25, 2001 (CUTX005704-06) **Confidential** |
| 14 | Centrix Financial Missouri Dealer Guidelines (CUTX005844-46) **Confidential** |
| 15 | Centrix Financial Minimum Amount Financed & Term (CUTX006184-85) |
| 16 | Centrix Financial *A Special Finance Solution for Automotive Dealerships* (Huffman0000772-76) |
| 17 | Centrix Enrollment Dealer Agreement (Huffman0000693-707) |
| 18 | Excerpts of Deposition of Elizabeth Newman, dated September 5, 2012 |
| 19 | Excerpts of Deposition of Eric Cooper, dated September 5-6, 2012 |
| 20 | Portfolio Servicing Agreement Between Centrix Resource Systems & Credit Union of Texas, dated November 19, 2001 & Addendum to Portfolio Servicing Agreement, LLC & Credit Union of Texas (CUTX005770-84) **Confidential** |
| 21 | Centrix Financial PMP Procedure GAP Insurance Policy Filing & Tracking, |

| | |
|---|---|
| | dated July 25, 2001 (CUTX005716-17) **Confidential** |
| 22 | Centrix Financial Certificate of Compliance, dated January 18, 2003, January 24, 2004 and February 2,2005 (CUTX006208-10) |
| 23 | NCUA Letter to Credit Unions re. Due Diligence Over Third Party Service Providers, dated November 2001, (Huffman002603-05) |
| 24 | Centrix Program Findings (Huffman0000646-56) |
| 25 | NCUA Letter to Credit Unions re. Specialized Lending Activities, dated September 2004 (Huffman0002635-37) |
| 26 | NCUA Risk Alert Notice to Federally Insured Credit Unions re. Specialized Lending Activities – Third Party Subprime Indirect Lending and Participations, dated June 2005 (Huffman0002645-55) **Confidential** |
| 27 | Credit Union of Texas Document of Resolution (Huffman0002641-2) **Confidential** |
| 28 | Omnibus Statement of Facts in Support of First Day Motions (Centrix-NCUA000254-64) |
| 29 | United States Bankruptcy Court, District of Colorado Involuntary Petition re. Centrix Financial, LLC, dated September 15, 2006 |
| 30 | United States Bankruptcy Court, District of Nevada Voluntary Petition re. Centrix Financial, LLC, dated September 19, 2006 |
| 31 | Retail Installment Contract & Security Agreement for Elaine Huffman dated January 10, 2003 (CUTX002381-84) **Confidential** |
| 32 | Centrix Financial Audit Recap for Elaine Huffman, dated January 27, 2003 (CUTX002296-99) **Confidential** |
| 33 | Centrix Financial Confirmation of Insurance on obligator Elaine Huffman (CUTX002334) **Confidential** |
| 34 | Notice of Pre-Sale to Elaine Huffman, dated January 17, 2005 (Huffman0003700) |
| 35 | Centrix Financial Charge Off Report Summary for Elaine Huffman (CUTX002396) **Confidential** |
| 36 | Letter to Elaine Huffman re. Notice of Deficiency, dated March 30, 2005 (CUTX002387) **Confidential** |
| 37 | Flatiron Financial Account Notes/Individual Statement Report of Elaine Huffman (CUTX002286-87) **Confidential** |
| 38 | Credit Union of Texas Membership Application & Account Authorization of Elaine Huffman (CUTX002308) **Confidential** |
| 39 | File Organization Summary (CUTX002302 & 2304) **Confidential** |
| 40 | Retail Installment Contract & Security Agreement of Charlene Sandler, dated October 12, 2002 (CUTX001537-39) **Confidential** |
| 41 | Centrix Financial, LLC Audit Recap of Charlene Sandler **Confidential** |
| 42 | Centrix Financial Confirmation of Insurance on Obligator Charlene Sandler, dated October 16, 2002 (CUTX001433) **Confidential** |
| 43 | Letter to Charlene Sandler re. Notice of Presale, dated January 21, 2005 (Huffman0003709) **Confidential** |
| 44 | Centrix Financial Charge-Off Summary Report of Charlene Sandler (CUTX001549) **Confidential** |
| 45 | Letter to Charlene Sandler re. Notice of Vehicle Resale, dated January 31, |

| | |
|---|---|
| | 2005 (CUTX01543) **Confidential** |
| 46 | Account Notes/Individual Statement Report of Charlene Sandler (CUTX001422-23) **Confidential** |
| 47 | Credit Union of Texas Membership Application & Account Authorization of Charlene Sandler, dated October 22, 2002 (CUTX001469) **Confidential** |
| 48 | File Organization Summary (CUTX001465-66) **Confidential** |
| 49 | Class Member Spreadsheet **Confidential** |
| 50 | Centrix Financial Credit Guideline Manual, dated July 1. 2002-July 31, 2003 (CUTX006186-207) |
| 51 | Letter from Jody Hall, Vice President of Remarketing to loan holder re. $100 check from Centrix Financial due to repossession notice errors, dated February 1, 2006 (Huffman0004124-25) |
| 52 | Order – Granting Plaintiff's Motion to Prohibit Defendants Centrix Financial from Engaging in Further Unsupervised Communications to Class Members & to Require Centrix to Send a Corrective Notice, and advising putative class members to return letters and checks to Centrix Financial. *April Smith v. Centrix Financial, LLC*, Case No 0516-05165, dated March 3, 2006 |
| 53 | Affidavit of Roy Frederick Walters, Walters Bender Strohbehn & Vaughan, dated October 5, 2012 |
| 54 | Deposition of Elaine Huffman, dated September 25, 2012 |
| 55 | Deposition of Charlene Sandler, dated September 27, 2012 |
| 56 | Supplemental Responses to Plaintiffs' First Set of Interrogatories and First Request for Production of Documents, dated December 1, 2011 |
| 57 | Loan Participation Agreement between Credit Union of Texas and Mission Federal Credit Union (CUTX006345 to CUTX006364) |
| 58 | APRWIN Calculations for Elaine Huffman |
| 59 | APRWIN Calculations for Charlene Sandler |
| 60 | Orders dated May 15, 2008 in *Mitchell v. Residential Funding Corp., et al.* substituting bankruptcy trustees |
| 61 | Orders dated November 26, 2007 and December 2, 2007 in *Mitchell v. Residential Funding Corp., et al.* denying defendants' motions for partial summary judgment as to Class Members who filed Chapter 7 and Chapter 13 Bankruptcies |
| 62 | Affidavit of Garrett M. Hodes |